NITRO DISTRIBUTING, INC.,
et al., Respondents,

v.

Jimmy V. DUNN, et al., Appellants.

No. SC 86854.

Supreme Court of Missouri,
En Banc.

May 2, 2006.

As Modified on Denial of Rehearing
June 30, 2006.

Gaspare J. Bono, Daniel G. Jarcho, Ray M. Aragon, Washington, D.C., Larry K. Bratvold, Michael K. Cully, Springfield, for appellants.

R. Dan Boulware, R. Todd Ehlert, Sharon Kennedy, St. Joseph, John C. Holstein,

William W. Francis, Brian D. Malkmus, Springfield, for respondents.

STEPHEN N. LIMBAUGH, JR., Judge.

Appellants seek reversal of the judgment of the circuit court overruling their motions to compel arbitration and stay litigation. After opinion by the Court of Appeals, Southern District, this Court granted transfer. Mo. Const. art. V, sec. 10. The judgment of the trial court is affirmed in part and reversed in part, and the case is remanded.[1]

## I. Facts and Procedural History

This case concerns the business relationships between respondents and appellants arising from their participation in Pro Net Global Association, Inc. (Pro Net), a network of businesses engaged in the sale and distribution of Amway-related business support materials (BSMs). Respondents are Nitro Distributing, Inc. (Nitro) and West Palm Convention Services, Inc. (West Palm), both owned by Ken Stewart, though Stewart personally is not a party. Appellants are: Jimmy V. Dunn (Dunn); Jimmy V. Dunn & Associates, Inc. (Dunn Associates); Harold Gooch, Jr. (Gooch); Gooch Support Systems, Inc. (Gooch Systems); Gooch Enterprises, Inc. (Gooch Enterprises); Bill S. Childers (Childers); TNT, Inc. (TNT); Thomas D. Foley (Foley); T & C Foley, Inc. (T & C); Steven S. Woods (Woods); G.F.I. International, Inc. (G.F.I.); Parker E. Grabill (Grabill); Grabill Enterprises, Inc. (Grabill Enterprises); Pro Net; Don Brindley (Brindley); Global Support Services, Inc. (Global); Pro Net Global I, Inc. (Pro Net I); and Robert A. Blanchard (Blanchard). As best as can be discerned, appellants are all Amway Corporation (Amway) distributors, Amway re-

---

1. A companion case involving most of the same issues, *Netco, Inc., et al. v. Jimmy V. Dunn, et al.,* 194 S.W.3d 353, 2006 WL 1147768 (Mo. banc 2006) (No. SC 86855), is also decided this date.

lated businesses, or their respective principals.

Amway is not a party in this case, but the questions raised require a brief explanation of Amway's business practices as they relate to the parties that are involved. Amway is a multi-level marketing corporation consisting of a network of independent distributors structured in a pyramid-like hierarchy. As part of Amway's standard distributorship agreement, there are "Rules of Conduct" that include a mandatory arbitration clause requiring Amway distributors to submit any dispute to arbitration through JAMS/Endispute, Inc., an independent arbitration entity.

As a method of improving sales, Amway produces and distributes motivational products called "tools" and "functions" aimed at training and motivating distributors. "Tools" are audiotapes, videotapes and published materials, and "functions" are seminars, rallies and conventions. Together, the tools and functions are commonly referred to as BSMs. A number of other businesses affiliated with Amway distributors sell their own Amway-related BSMs, though Amway distributors themselves are prohibited from doing so under the Rules of Conduct. As used in the Amway corporate culture, an Amway "organization" is a term of art for the conglomeration of an Amway distributorship, its owner(s), and their independent tools and functions businesses.

Pro Net was formed in 1998 to "facilitate the sale of Amway-related BSMs to its members," apparently as a kind of clearinghouse. Those wishing to join Pro Net were required to submit applications mandating compliance with Pro Net's "Terms and Conditions." This not only required members to abide by Amway's Rules of Conduct, but also required members to submit any dispute to arbitration under a separate arbitration clause in which arbitrations were to be administered by the American Arbitration Association.

Ken Stewart formed Nitro in 1988 as a tools business, and West Palm in 1992 as a functions business, for the support of his Amway distributorship, Stewart & Associates International, Inc. (Stewart Associates). In 1998, Stewart submitted a Pro Net membership application on behalf of Nitro, but neither Stewart, nor any officer or agent of West Palm signed a membership application on behalf of West Palm.

Prior to Pro Net's incorporation, BSM distributors known as the "Yager Group" supplied Stewart and other Pro Net founders with tools, and the Pro Net plan, in part, was to fold the Yager Group into Pro Net. During the period of transition from the Yager Group to Pro Net, the founders of Pro Net, including Stewart, entered into a "Transition to Pro Net" agreement. In part, the agreement required parties to submit disputes arising from the transition from the Yager Group to Pro Net to binding arbitration through JAMS/Endispute.

In 2001, Nitro and West Palm (but not Stewart Associates) filed lawsuits alleging, *inter alia*, that appellants were involved in a conspiracy to misappropriate respondents' businesses. Appellants—some, but not all, of whom are members of Pro Net—filed a motion to compel arbitration under Pro Net's Terms and Conditions, the Transition to Pro Net Agreement, and Amway's Rules of Conduct. After considerable discovery, the parties submitted a voluminous amount of evidence to the motion court consisting of more than 3,700 pages of documents, affidavits, deposition transcripts and other materials. After a hearing and extended argument on the matter, the court overruled the motion. This appeal followed, as authorized under the Missouri Uniform Arbitration Act (MUAA), sec. 435.440, RSMo 2000.

II. Analysis

When faced with a motion to compel arbitration, the motion court must determine whether a valid arbitration agreement exists and, if so, whether the specific dispute falls within the scope of the arbitration agreement. *Dunn Indus. Group, Inc. v. City of Sugar Creek*, 112 S.W.3d 421, 427–28 (Mo. banc 2003). In making these determinations, the court should apply the usual rules of state contract law and canons of contract interpretation. *Id.* at 428. Appellate review is *de novo*. *Id.*

A. Amway Agreement

1. Nitro and West Palm as Non-signatories

Appellants first argue that Nitro and West Palm are bound by the arbitration clause contained in the Amway Rules of Conduct. However, neither Nitro nor West Palm are signatories to any agreement with Amway. Moreover, according to Amway's own documents, Nitro and West Palm are BSM businesses that operate in an industry entirely independent of Amway. Nonetheless, appellants seek to bind Nitro and West Palm as third-party beneficiaries of Ken Stewart or Stewart Associates' distributorship agreement with Amway.

To be bound as a third-party beneficiary, the terms of the contract must clearly express intent to benefit that party or an identifiable class of which the party is a member. *Peters v. Employers Mut. Cas. Co.*, 853 S.W.2d 300, 301 (Mo. banc 1993). In cases where the contract lacks an express declaration of that intent, there is a strong presumption that the third party is not a beneficiary and that the parties contracted to benefit only themselves. *State ex rel. William Ranni Assocs., Inc. v. Hartenbach*, 742 S.W.2d 134, 141 (Mo. banc 1987). Furthermore, a mere incidental benefit to the third party is insufficient to bind that party. *Id.* at 140. Here, the Amway distributorship agreement expresses no intent whatsoever to benefit Nitro and West Palm, and any benefit obtained from the agreement, if at all, was incidental. Accordingly, Nitro and West Palm are not third-party beneficiaries.

Appellants also attempt to bind Nitro and West Palm under the theory that they acted as agents of Ken Stewart or Stewart Associates. In support, appellants cite *Byrd v. Sprint Commc'ns Co., L. P.*, 931 S.W.2d 810, 815 (Mo.App.1996), for the proposition that "non-signatory agents [are] bound by arbitration agreements signed by their principals." In our view, though, *Byrd* was wrongly decided. Under hornbook rules of agency, it is the principal that can be bound by the signature of the agent, not the agent that can be bound by the signature of the principal. This is so because the principal can control the conduct of the agent, which is the essence of the agency relationship. *State ex rel. Bunting v. Koehr*, 865 S.W.2d 351, 353 (Mo. banc 1993). It is not the other way around, that the agent can control the principal. Otherwise, the principal would be the agent for the agent. Thus, without the benefit of *Byrd*, the agency theory is to no avail, and the rule controls that "[a] party cannot be required to arbitrate a dispute that it has not agreed to arbitrate." *Dunn*, 112 S.W.3d at 436. To the extent it is to the contrary, *Byrd* is overruled.

Finally, appellants claim that Nitro and West Palm are bound to arbitrate under the Amway Rules of Conduct on the basis that they agreed to be bound by Pro Net's Terms and Conditions. The rationale is that Pro Net's Terms and Conditions contain a general requirement that Pro Net members abide by the Amway Rules of Conduct, which include the Am-

way arbitration clause. This rationale, of course, presupposes that Nitro and West Palm are members of Pro Net, an issue that will be addressed, *infra.* Assuming, though, that Nitro and West are members of Pro Net and bound by Pro Net's Terms and Conditions, the Amway arbitration clause still does not apply. A separate Pro Net arbitration clause is explicitly set forth in the Terms and Conditions that is significantly different from the Amway clause and that is specific to Pro Net membership only. Under well-established contract principles, where an apparent inconsistency exists between a clause that deals with an issue specifically and one that deals with the same issue generally, the specific clause should be held to nullify the general clause. *State ex rel. Smith v. City of Springfield,* 375 S.W.2d 84, 91 (Mo. banc 1964). Because the Pro Net clause is specific to disputes "arising out of" or "relating to" Pro Net membership, the Amway Clause has been superseded by the Pro Net clause.

### 2. Scope of Amway Clause

■ Whatever their relationship with Amway, Nitro and West Palm contend that the scope of the arbitration agreement does not cover the disputes that are the subject of their petition against appellants. This Court agrees.

The Amway arbitration clause states:

[T]he parties are required to submit any remaining claim(s) arising out of or relating to their Amway Distributorship, the Amway Sales and Marketing Plan, or the Amway Rules of Conduct (including any claim against another Amway distributor, or any such distributor's officers, directors, agents, or employees or against Amway Corporation or any of its officers, directors, agents, or employees) to binding arbitration in accordance with the Amway/ADA Arbitration Rules.

This is not a suit against Amway. Nor are Nitro and West Palm's claims brought pursuant to any Amway distributorship. Nor do Nitro and West Palm make any allegation pertaining to the Amway Sales and Marketing Plan. Nor do they allege that appellants violated the Amway Rules of Conduct or any other part of the Amway agreement. And in that regard, the petition expressly states, "This action is not predicated upon the Amway Rules (since the BSMs industry is not a party of the Amway business), nor does it seek the enforcement of any such Rules." Instead, the subject and entire focus of the lawsuit is that appellants allegedly conspired to misappropriate Nitro and West Palm's BSM businesses. According to Amway's own documents, in order to avoid antitrust concerns, BSM businesses are organized in and operate in an industry entirely independent of Amway. And in fact, Amway promulgated and distributed a separate BSM arbitration agreement for use by the Amway dealers' independent BSM businesses, in lieu of the arbitration clause in the Amway Rules of Conduct. Although this Court is mindful of the many cases holding that the scope of arbitration agreements is to be liberally construed, the Amway clause in this case is clear on its face and cannot be stretched to cover the lawsuit herein.

### B. Transition to Pro Net Agreement

■ Appellants next argue that Nitro and West Palm are bound to arbitrate under the Transition to Pro Net Agreement on the basis that Ken Stewart signed the agreement on behalf of his "organization." Appellants' argument on this point, however, discounts the fact that Ken Stewart signed the agreement only in his individual capacity and not on behalf of any separate entity. The signature block of the agreement contains three lines: a "By" line, a "Dated" line, and a "For" line, and

Stewart signed his name on the "By" line, leaving the "For" line blank. In contrast, a number of other signatories signed their names in the "By" line *in addition* to signing the name of the corporation on behalf of which they were signing in the "For" line. In short, the Transition to Pro Net Agreement does not indicate any intent on the part of Stewart to bind Nitro and West Palm.

Appellants nevertheless maintain that "paragraph 1" of the transition agreement proves the point that Stewart signed on behalf of his "organization." That paragraph states:

> The Parties hereby agree to submit to final and binding arbitration with J*A*M*S/ENDISPUTE, in accordance with Rule 7 of the Amway/ADA Arbitration Rules and Procedures any and all issues arising out *of* the transition of the Foley, Gooch, Childers, Stewart and Woods organizations from working with D & B Enterprises, Inc. and InterNet Services to being responsible for the training and education of their distributor organizations.

The fallacy of appellants' argument, as Nitro and West Palm aptly put, "is that this paragraph defines the *scope* of arbitrable claims, not the *parties* to it." The focus, or scope, is on the "transition"—the claims arising from the split between the five organizations and D & B Enterprises and InterNet Services. The agreement binds Stewart individually to arbitrate any claims he may have individually that arise from the transition of his organization to the Pro Net scheme. But the scope of the arbitration clause is irrelevant in the determination of which parties bound themselves to it. The clause itself is no evidence that Stewart agreed to submit his "organization's" claims to arbitration.

C. Pro Net Agreement

1. West Palm

There is no dispute that West Palm did not sign a Pro Net membership application. However, appellants seek to compel West Palm to arbitrate under the arbitration clause in Pro Net's Terms and Conditions as a third-party beneficiary of Ken Stewart or Stewart Associates' agreement with Pro Net. For the same reasons that West Palm is not a third-party beneficiary of the agreement with Amway, it is not a third-party beneficiary of the Pro Net agreement. The Pro Net Terms and Conditions do not express any intent to benefit West Palm. Further, to the extent that West Palm did obtain any benefit from Pro Net, the benefit was merely incidental to Stewart's relationship with Pro Net, and, as explained, an incidental benefit is insufficient to establish third-party beneficiary status.

Appellants also argue that West Palm is estopped from avoiding arbitration under the Pro Net agreement with Stewart because West Palm received benefits from Pro Net membership. To be sure, "[b]y accepting benefits, a party may be estopped from questioning the existence, validity and effect of a contract," *Dunn*, 112 S.W.3d at 437 (citing *Dubail v. Medical West Bldg. Corp.*, 372 S.W.2d 128, 132, (Mo.1963)), but here, appellants do not identify any benefits to West Palm. They claim instead only that "Nitro and Stewart had access to the tapes of other Pro Net members that they otherwise would not have had the right to purchase and sell" and that "the Stewart Organization profited from selling Mr. Stewart's audio tapes through Pro Net...." There is no allegation that West Palm, itself, as opposed to Nitro or Stewart Associates, was doing business with Pro Net or otherwise availing itself of Pro Net membership.

Appellants' legal theory on the estoppel issue is unclear, but it seems to be (1) that

West Palm is estopped even if it benefited only indirectly from Nitro and Stewart's membership in Pro Net, and (2) that West Palm is estopped because it is the alter ego of Nitro and Stewart Associates, and (3) that in any event, West Palm conceded that it is a member of Pro Net. On the first point, appellants cite no case holding that mere indirect benefits are sufficient to establish estoppel, and although Missouri courts have not expressly addressed the issue, the authority from other courts is wholly to the contrary and wholly persuasive. *See, e. g., Thomson–CSF, S.A. v. American Arbitration Ass'n,* 64 F.3d 773, 779 (2d Cir.1995). *See also* 31 C.J.S. *Estoppel and Waiver* sec. 123 (1996). The reasoning, of course, is that the nonsignatory is benefiting from the contractual relationship of those who are indeed parties to the contract, rather than benefiting from the contract, itself. *Thomson–CSF, S.A.,* 64 F.3d at 779.

■■■ On the second point—the alter ego theory—Appellants would have this Court disregard West Palm's status as a separate and independent corporation, but the only way to achieve that result is by piercing the corporate veil. That remedy, however, in the context of the issues presented here, is only available where outside control of the corporation has been used "to commit fraud or wrong, to perpetrate the violation of statutory or other positive legal duty, or [a] dishonest and unjust act...." *66, Inc. v. Crestwood Commons Redevelopment Corp.,* 998 S.W.2d 32, 40 (Mo. banc 1999). Suffice it to say that appellants have neither pled nor proven this element.

■■■ As for the third point, appellants make much of the fact that respondents pled in a related federal case that "Nitro and West Palm were lured into Pro Net and then boycotted or minimized." In the context of the entire complaint, however, plaintiffs were merely making the point that Pro Net was part of a larger conspiracy to misappropriate the respondents' businesses in which appellants were giving Amway-related companies the option of joining Pro Net or being boycotted from the BSMs industry. They were not, as appellants suggest, conceding that West Palm had agreed to the Pro Net Terms and Conditions or taken advantage of Pro Net membership. The same holds true, in context, for respondents' preparation of a summary chart for discovery purposes showing Nitro and West Palm under Pro Net's umbrella. There is no estoppel by concession.

In sum, because West Palm is a separate corporation from Nitro and Stewart Associates, was not a signatory to the Pro Net agreement, and did not accept direct benefits from Pro Net, it is not now estopped to deny Pro Net membership.

2. Nitro

■■■ The one point on which this Court disagrees with the trial court is its ruling that Nitro is not bound to arbitrate under the Pro Net agreement. It is undisputed that on the Pro Net application Stewart submitted, in the line provided for "Member Name," Stewart plainly wrote "Ken Stewart/Nitro Distributing." He then signed the application with his name, Ken Stewart, and in the line below that provided for "Title," he wrote "president—Nitro Distrib." He also included Nitro's Federal Tax Identification Number rather than his own. By executing the Pro Net application in this unequivocal way, Stewart, Nitro's president, bound Nitro to the Pro Net agreement. This is so because of the long-held precedent "that the president of a corporation may, without any special authority from its board of directors, perform all acts of an ordinary nature which by usage or necessity are incident to his office, and may bind the

corporation by contracts in matters arising in the usual course of business." *Gaar v. Gaar's Inc.*, 994 S.W.2d 612, 619 (Mo.App. 1999) (citing *Sparks v. Despatch Transfer Co.*, 104 Mo. 531, 15 S.W. 417, 419 (1891)).

 Nitro claims, however, that the contract should be rescinded or reformed on the basis of Stewart's unilateral mistake in believing that BSM businesses like Nitro were eligible for Pro Net membership when, in fact, under the Pro Net bylaws, only Amway distributorships were eligible for membership. According to Nitro, the unilateral mistake prevented a meeting of the minds on the essential terms of the contract. Rescission on the basis of unilateral mistake, however, is warranted only in exceptional circumstances. Under the RESTATEMENT (SECOND) OF CONTRACTS, sec. 153 (1981):

> Where a mistake of one party at the time a contract was made as to a basic assumption on which he made the contract has a material effect on the agreed exchange of performances *that is adverse to him,* the contract is voidable by him if he does not bear the risk of the mistake. . . .

(Emphasis added). In this case, the mistake clearly inured to the *benefit* of Nitro; it was not *adverse* to Nitro. Although Nitro was technically ineligible for membership, Pro Net in fact accepted Nitro's membership application and presumably afforded Nitro the benefits of membership nonetheless. Although the nature and extent of benefits afforded by Pro Net membership and the extent to which Nitro availed itself of those benefits (if at all) is a hotly contested issue, the critical point is that membership in Pro Net, whatever its worth, was not something adverse to Nitro. In denying relief to Nitro, this Court emphasizes that rescission is, after all, an equitable remedy, and that the unilateral mistake doctrine balances the equities by ensuring that the party seeking rescission cannot avoid its obligations under the contract where, as here, the mistake caused it no harm. This reasoning holds true for the remedy of reformation as well, and Nitro offers no independent legal argument in support of the remedy.

 Alternatively, though, Nitro contends that even if it is to be considered a member of Pro Net, it should be classified under the Pro Net bylaws as a "founding" member, rather than a "regular" member, and that the arbitration provision was intended to apply only to those applying for regular membership. Although the bylaws do set out the classification of members as "founding" and "regular," and Stewart considered himself to be a founding member, the membership application he signed on Nitro's behalf stated unambiguously that the applicants were required to abide by the Pro Net Terms and Conditions, which included the arbitration provision. It is the most basic principle of contract law that parties are bound by the terms of the contracts they sign and courts will enforce contracts according to their plain meaning, unless induced by fraud, duress, or undue influence. *Utility Service and Maintenance, Inc. v. Noranda Aluminum, Inc.*, 163 S.W.3d 910, 913 (Mo. banc 2005). Ultimately, Nitro fails to identify any legal theory to overcome the binding effect of Stewart's signature.

D. Appellants' Standing to Compel Arbitration

 This Court's holding that Nitro is bound to arbitrate under the Pro Net arbitration clause is complicated by the fact that not all of the eighteen appellants are members of Pro Net so as to have standing to compel arbitration. Indeed, Nitro argues, for one reason or another, that none of the eighteen appellants are members of Pro Net. However, Pro Net itself

can compel arbitration under the express language of the Pro Net Terms and Conditions, and Nitro concedes that appellant Blanchard, who is sued in his capacity as an officer of Pro Net, has the same rights as Pro Net. In addition, six of the appellants—Gooch, Childers, Foley, Woods, Grabill and Dunn—personally signed the Pro Net membership application. Although Nitro claims that all of these individuals except Dunn signed as "founding" members and that only "regular" members can avail themselves of the Pro Net arbitration clause, they, like Stewart and Nitro, did in fact sign the Pro Net membership application, were admitted to membership and, thus, can compel arbitration. Unlike Stewart, however, these individuals did not sign on behalf of their distributorships, Gooch Systems and Gooch Enterprises, TNT, T & C, G.F.I., Grabill Enterprises, and Dunn Associates, respectively. As to these seven appellants, Nitro requests "as a result of a misnomer" that four of them—T & C, GFI, Grabill Enterprises and Dunn Associates—be dismissed as parties defendant, and the trial court is directed to grant that request.

 Though they stay in the case, the other three distributorship/appellants (Gooch Systems, Gooch Enterprises, and TNT) cannot compel arbitration because they are not signatories to the Pro Net agreement. The same is true for appellants Pro Net I, Global, and Global's principal, Brindley. Although appellants correctly state that a non-signatory may, in some instances, compel a signatory to arbitrate under the theory that the plaintiff/signatory is estopped from refusing to arbitrate, that is not the case here. The estoppel theory in this context is most often applied in cases where a plaintiff

alleges that a defendant is liable under the terms of a contract, even though the defendant was a non-signatory to the contract. These allegations might be made, for instance, in cases where the defendant itself is estopped from denying liability under the contract, or where defendant is a third-party beneficiary, or in cases where the defendant/non-signatory was an agent or alter ego of a signatory.[2] In a case frequently cited on this issue, the Seventh Circuit explained the rule as follows:

> [I]t would be manifestly inequitable to permit [plaintiff] to both claim that [the non-signatory party] is liable to [plaintiff] for its failure to perform the contractual duties described in the agreement and at the same time deny that [the non-signatory] is a party to that agreement in order to avoid arbitration of claims clearly within the ambit of the arbitration clause.

*Hughes Masonry Co., Inc. v. Greater Clark County School Bldg. Corp.*, 659 F.2d 836, 838-39 (7th Cir. 1981). *See also Dominium Austin Partners, L.L.C. v. Emerson*, 248 F.3d 720 (8th Cir. 2001). Under this reasoning, the non-signatory in *Hughes* was able to compel arbitration because the very basis of the claim against the non-signatory was that it had breached duties and responsibilities purportedly assigned it by the agreement. This result follows in cases of this kind because the plaintiff "should not be allowed to assume the inconsistent position of affirming a contract in part by accepting or claiming its benefits, and disaffirming it in part by repudiating or avoiding its obligations, or burdens." *Dubail*, 372 S.W.2d at 132.

 The case at hand, however, is altogether different. Plaintiffs are not claim-

---

**2.** These are, of course, the same categories of claims that defendants here have pressed against plaintiffs to hold them to the Amway and Pro Net contracts and the respective arbitration clauses.

ing that these appellants are liable for failing to perform some term of the Pro Net agreement but, instead, are arguing, as noted again, that Pro Net served as co-conspirator to misappropriate their business. Furthermore, to the extent these appellants contend that they should be allowed to compel arbitration under the related theory that the claims against them are "inextricably intertwined with those against Pro Net," that theory is inconsistent with the overarching rule that arbitration is ultimately a matter of agreement between the parties. *See Dunn,* 112 S.W.3d at 436.

### E. Jury Trial Issue

Finally, Nitro contends that in the event this Court holds that the trial court erred in ruling that Nitro was not bound to arbitrate, then the proper disposition is not to order arbitration, but to remand for a jury trial as provided by the Federal Arbitration Act (FAA), and if not a jury trial, then a full evidentiary hearing replete with findings of fact and conclusions of law. Only then, Nitro contends, can the disputed factual issues be resolved to determine whether a valid arbitration agreement exists. Appellants, on the other hand, argue that the issues should be determined only in a summary proceeding, as specified in section 435.355(1).

 As Nitro correctly observes, the FAA unambiguously provides for a jury trial when factual disputes arise in federal courts regarding the making of an arbitration agreement. 9 U.S.C. sec. 4 (2000). However, neither the United States Supreme Court nor this Court has determined whether parties are entitled to a jury trial when identical disputes arise in state courts. While the FAA's substantive law applies in state courts, the procedural provisions of the FAA do not bind state courts unless the state procedures in some way defeat the rights granted by Con-

gress. *Southland Corp. v. Keating,* 465 U.S. 1, 16, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984). Thus, this Court will look to the procedures set out in the MUAA rather than the FAA. The pertinent MUAA procedure, then, is section 435.355(1), which states:

On application of a party showing an agreement described in section 435.350, and the opposing party's refusal to arbitrate, the court shall order the parties to proceed with arbitration, but if the opposing party denies the existence of the agreement to arbitrate, the court *shall proceed summarily* to the determination of the issue so raised and shall order arbitration if found for the moving party; otherwise, the application shall be denied.

(emphasis added). Although this Court has not expressly addressed the meaning of the term "proceed summarily," and the statute does not provide a special definition, under the legal definition, which this Court now adopts, summary proceedings are those that are conducted "[w]ithout the usual formalities [and] without a jury." BLACK'S LAW DICTIONARY 1476 (8th ed.1999). *See also Rogers v. Dell Computer Corp.,* 127 P.3d 560 (Okla.2005); *Jack B. Anglin Co. v. Tipps,* 842 S.W.2d 266 (Tex.1992) (holding that the "proceed summarily" language in the UAA does not require a jury trial on the existence of an arbitration agreement).

 The language of section 435.355(1) notwithstanding, Nitro contends that the denial of a jury trial would deprive it of its constitutional right to a trial by jury in civil actions. However, this argument mischaracterizes the nature of the motion to compel arbitration, which, in essence, is an equitable remedy designed to compel specific performance of a term in a contract. *Rosenthal v. Great W. Fin. Sec. Corp.,* 14 Cal.4th 394, 58 Cal.Rptr.2d

875, 926 P.2d 1061, 1070 (1996). In civil actions, of course, the right to trial by jury attaches only to actions at law for which damages may be awarded, not to suits in equity. *State ex rel. Diehl v. O'Malley*, 95 S.W.3d 82, 85 (Mo. banc 2003). Though the motion to compel arbitration is ancillary to the underlying action at law, it is a separate proceeding authorized under section 435.355(1) in which equitable relief is sought.

Nitro's fallback position that the summary proceeding conducted by the motion court was otherwise inadequate also fails. Where, as here, there were disputed factual issues, it is necessary to conduct an evidentiary hearing. However, given the summary nature of the proceedings, it is not enough for Nitro to say that the motion court declined to entertain live witnesses and cross-examination or to provide findings of fact and conclusions of law. As noted, the motion court was provided with more than 3700 pages of documents, affidavits, deposition transcripts and other materials with which to resolve the factual disputes. Having also reviewed this voluminous mass, this Court is quite satisfied that the evidence presented on both sides was more than ample to resolve those disputes in the summary fashion dictated by the statute.

III. Summary and Conclusion

This Court holds:

1. Nitro was not entitled to a jury trial to determine whether a valid arbitration agreement exists, and the motion court properly conducted a summary proceeding on that issue.

2. At the request of Nitro and West Palm, the trial court is directed to dismiss appellants T & C, GFI, Grabill Enterprises and Dunn Associates as parties defendant.

3. Nitro is bound to arbitrate its claims against appellants Gooch, Childers, Foley, Woods, Grabill, Dunn, Pro Net, and Blanchard under the arbitration clause set out in the Terms and Conditions of the Pro Net agreement.

4. Nitro is not bound to arbitrate its claims against appellants Gooch Systems, Gooch Enterprises, TNT, Pro Net I, Global and Brindley under the Pro Net agreement, nor is Nitro is bound to arbitrate its claims against any of the appellants under the arbitration clauses in the Amway agreement or the Transition to Pro Net agreement.

5. West Palm is not bound to arbitrate its claims under any of the three arbitration clauses.

Because some of the appellants can compel Nitro to arbitrate and others cannot and because West Palm cannot be compelled to arbitrate by any of them, the issue arises whether the trial court should stay the litigation of all the claims pending arbitration. The parties agree that this determination lies within the trial court's discretion and that the case must be remanded for that purpose. *See AgGrow Oils, L.L.C. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 242 F.3d 777, 782–83 (8th Cir.2001); *Fru–Con Constr. Co. v. Sw. Redev. Corp. II*, 908 S.W.2d 741, 746 (Mo. App.1995).

The judgment of the trial court is affirmed in part and reversed in part, and the case is remanded.

All concur.