

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| **DISRUPTION 8, LLC,** | ) | |
| | ) | |
| Respondent, | ) | **WD87028** |
| **v.** | ) | |
| | ) | **OPINION FILED:** |
| | ) | **March 4, 2025** |
| **VERTICAL ENTERPRISE, LLC,** | ) | |
| | ) | |
| Appellant. | ) | |

**Appeal from the Circuit Court of Buchanan County, Missouri
The Honorable Kate Schaefer, Judge**

**Before Division Three:** W. Douglas Thomson, Presiding Judge and
Karen King Mitchell and Thomas N. Chapman, Judges

Vertical Enterprise, LLC (Vertical), appeals the circuit court's denial of its motion to compel arbitration of a dispute regarding repayment of a loan, raising a single point of error that Disruption 8, LLC (Disruption), signed a valid arbitration provision in a different but contemporaneous contract that was broad enough in scope to apply to the separate loan contract. Finding no error, we affirm.

## Background

Vertical is a licensed marijuana manufacturer and seller with its principal place of business in St. Joseph, Missouri. In January 2021, Vertical entered into three separate

contracts with Disruption: (1) a loan agreement entitled "Credit Facility" (the Loan Agreement); (2) a Subscription Agreement; and (3) a "Second Amended and Restated Operating Agreement"[1] (Operating Agreement). The Loan Agreement identified Disruption as the lender and Vertical as the borrower of $2 million. The Loan Agreement stated that its purpose was "financing the business operations of [Vertical]" and that it was "issued to [Vertical] pursuant to the terms of the certain Subscription Agreement." Under the Subscription Agreement, Vertical transferred 800 "units" in Vertical to Disruption in return for the $2 million loan. The Subscription Agreement stated that the "Offering Documents[2] constitute the entire agreement between the parties regarding the subject matter contained herein and supersedes all prior or contemporaneous agreements, representations and understandings of the parties." Vertical acknowledges that neither the Loan Agreement nor the Subscription Agreement contains an alternative dispute resolution clause, incorporates such a clause by reference, or refers to such a clause in any other contract between the parties.

On February 17, 2021, the Operating Agreement took effect. The Operating Agreement was signed by Vertical's members, which at this point included Disruption. The Operating Agreement states that it "sets forth the Members' understanding and agreement with respect to the organization and operation of [Vertical]"; that it was made

---

[1] Previous versions of the "operating agreement" between Vertical and its members, which did not include Disruption, were not included in the record.

[2] The term "Offering Documents" was defined by the Subscription Agreement to include (1) the Subscription Agreement, (2) the November 2, 2020 Private Placement Memorandum, and (3) the Confidential Accredited Investor Verification Form attached to the Private Placement Memorandum—not the Operating Agreement.

by its members "in consideration of the covenants and the promises made herein"; and that it was set forth "in its entirety" in its twenty-eight pages (excluding the members' signature pages and one exhibit listing the members' names).

Although the Operating Agreement refers to "capital contributions" by its members, it identifies no debts owed by Vertical generally[3] or to Disruption specifically. Section 16.7 of the Operating Agreement contains the following alternative dispute resolution clause:

> All disputes and controversies between or among [Vertical] and/or the Members arising out of or in connection with this Agreement[4] ("Claims") shall be subject to mediation as a condition precedent to arbitration described in Section 16.7(b). . . . All Claims that cannot be settled through mediation . . . shall be decided by neutral, final and binding arbitration.

Pursuant to the terms of the Loan Agreement, Vertical's "insolvency" is an event of default. In October 2023, Disruption filed a one-count petition alleging breach of the Loan Agreement due to Vertical's insolvency. Vertical filed an answer denying that it was insolvent and moved to compel arbitration, which, after a hearing, the circuit court denied. This appeal follows.

---

[3] In Section 3.3, the Operating Agreement refers to "any loan made by [Different Member]" regarding Different Member's right to issue marijuana licenses issued to Vertical by the state of Missouri. The Operating Agreement's "Article XII. Accounting and Fiscal Matters" refers to Vertical's obligation to maintain records and copies of various documents, including any "promise[s] by a Member to contribute cash, property or services," at its principal place of business. In Section 15.3, regarding distribution of assets in the event of Vertical's dissolution, the Operating Agreement refers to "creditors of [Vertical] (including members who are creditors in respect of debts owed by [Vertical] to such Members)."

[4] "Agreement" is defined in the Operating Agreement as "this Amended and Restated Operating Agreement, as may be amended from time to time."

3

**Analysis**

Vertical appeals the circuit court's denial of its motion to compel arbitration of a dispute regarding repayment of a loan, raising a single point of error that Disruption signed a valid arbitration provision in a different but contemporaneous contract that was broad enough in scope to apply to the separate loan contract.

"When faced with a motion to compel arbitration, the motion court must determine whether a valid arbitration agreement exists and, if so, whether the specific dispute falls within the scope of the arbitration agreement." *Nitro Distrib., Inc. v. Dunn*, 194 S.W.3d 339, 345 (Mo. banc 2006), *as modified on denial of reh'g* (June 30, 2006). "Whether or not a dispute is covered by an arbitration agreement is a question of law for the courts." *Kansas City Urology, P.A. v. United Healthcare Servs.*, 261 S.W.3d 7, 11 (Mo. App. W.D. 2008). Appellate review of the circuit court's determination is *de novo. Id.*

Under the Federal Arbitration Act, 9 U.S.C. § 2 (2022) (FAA), arbitration agreements are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." "[T]his provision [of the FAA] allows arbitration agreements 'to be invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability, but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue.'" *Bertocci v. Thoroughbred Ford, Inc.*, 530 S.W.3d 543, 551 (Mo. App. W.D. 2017) (quoting *Eaton v. CMH Homes, Inc.*, 461 S.W.3d 426, 432 (Mo. banc 2015)). "As such, arbitration agreements are tested through a lens of ordinary state-law principles that

govern contracts[.]" *Id.* (quoting *Eaton*, 461 S.W.3d at 432). Therefore, when determining whether a valid arbitration agreement exists, we "apply the usual rules of state contract law and canons of contract interpretation." *Nitro Distrib.*, 194 S.W.3d at 345. Because "[t]he three essential elements of a valid contract are offer, acceptance, and bargained for consideration," *Bridgecrest Acceptance Corp. v. Donaldson*, 648 S.W.3d 745, 752 (Mo. banc 2022), "[a] party cannot be compelled to arbitration unless the party has agreed to do so." *Kansas City Urology*, 261 S.W.3d at 11. "Policies favoring arbitration are 'not enough, standing alone, to extend an arbitration agreement beyond its intended scope because arbitration is a matter of contract.'" *Manfredi v. Blue Cross & Blue Shield of Kansas City*, 340 S.W.3d 126, 131 (Mo. App. W.D. 2011) (quoting *Kansas City Urology*, 261 S.W.3d at 11).

An agreement to arbitrate is an exercise of "the parties' right to contractually agree to relinquish substantial rights." *Malan Realty Invs., Inc. v. Harris*, 953 S.W.2d 624, 626 (Mo. banc 1997). Therefore, "any curtailment" of the right to a jury trial, which is what arbitration agreements do, "should be scrutinized with utmost care." *Holm v. Menard, Inc.*, 618 S.W.3d 669, 677 (Mo. App. W.D. 2021) (quoting *Attebery v. Attebery*, 507 S.W.2d 87, 93 (Mo. App. 1974)). Thus, to be a valid waiver of a party's right to a jury trial, an arbitration agreement must be "clear, unambiguous, and conspicuous." *Id.*

Here, both parties signed the Operating Agreement containing an arbitration clause, but Disruption's petition alleging breach of the Loan Agreement does not concern a dispute "arising out of or in connection with" the Operating Agreement. Vertical argues that the language in the Operating Agreement's arbitration clause is broad enough

to apply to a dispute concerning the Loan Agreement because the two contracts, executed contemporaneously, were "part of the same deal." We disagree.

Arbitration clauses are generally construed as "broad" or "narrow." *Dunn Indus. Grp., Inc. v. City of Sugar Creek*, 112 S.W.3d 421, 428 (Mo. banc 2003). "A broad arbitration provision covers all disputes *arising out of* a contract to arbitrate; a narrow provision limits arbitration to specific types of disputes." *Id.* (emphasis added); *see also Fleet Tire Serv. of N. Little Rock v. Oliver Rubber Co.*, 118 F.3d 619, 621 (8th Cir. 1997). An arbitration clause may be "exceedingly broad," such as where the parties agree to arbitrate "in the event of a dispute between the parties." *Manfredi*, 340 S.W.3d at 131. Although the arbitration clause in the Operating Agreement is "broad," it covers only disputes "arising out of or in connection with" the Operating Agreement, not those arising out of the Loan Agreement, which contained no arbitration clause.

When the contract at issue contains no express arbitration clause, arbitration may be compelled only if the circumstances demonstrate a clear agreement to arbitrate. *See Holm*, 618 S.W.3d at 677 (requiring that a jury trial waiver be "unequivocal, plain, and clear"); *Dunn Indus. Group*, 112 S.W.3d at 436 (holding that a contract's "[m]ere reference" to another contract "is insufficient to establish that [a party] bound itself to the arbitration provision of the [other] contract"). Parties may be compelled to arbitrate if the contract at issue incorporates by reference an arbitration clause in another contract. *Id.* Also, if the parties contemporaneously execute documents "relating to the same subject," and one of the documents contains an arbitration clause, arbitration may be compelled in a dispute involving a related document "unless 'the realities of the situation' indicate that

6

the parties did not so intend." *Johnson ex rel. Johnson v. JF Enters., LLC*, 400 S.W.3d 763, 767 (Mo. banc 2013) (quoting *Martin v. U.S. Fidelity Corp.*, 996 S.W.2d 506, 511 (Mo. banc 1999)). Contracts do not relate to the same subject, however, when they cover "distinct aspects of the parties' transaction." *Arizon Structures Worldwide, LLC v. Global Blue Technologies-Cameron, LLC*, 481 S.W.3d 542, 548 (Mo. App. E.D. 2015). In *Arizon*, the "distinct aspects" were evidenced by the first contract, a non-disclosure agreement "executed in anticipation of" future product sales between the parties, as compared with the ensuing sales contract that described "the scope of work, schedule of payments, and terms and conditions of the sale" of products). *Id.* at 544, 548 (holding that arbitration could not be compelled for several reasons, including that of the "distinct aspects" of the two contracts' purposes). In essence, the claim "must raise some issue[,] the resolution of which requires *reference to or construction of some portion of the parties' contract* [containing the arbitration agreement]." *Nw. Chrysler Plymouth, Inc. v. DaimlerChrysler Corp.*, 168 S.W.3d 693, 696 (Mo. App. E.D. 2005) (emphasis added).

Arbitration was compelled in *Johnson* because the consumer signed a number of documents all "[a]s a part of the sale transaction" to buy a car, including an installment contract and an arbitration agreement. *Johnson*, 400 S.W.3d at 764. The arbitration agreement was a separate document, not a clause in any of the other documents, and it specifically covered claims or disputes "arising out of or relating to the credit application, purchase or condition of the vehicle, the purchase or financing contract, or any resulting transaction or relationship." *Id.* at 765. Because the documents were all clearly part of the same transaction—the entire purchase and financing of the car, as specifically

7

mentioned *by* the arbitration clause—the installment contract, despite not separately including or incorporating an arbitration clause, was subject to the separate arbitration agreement. *Id.* at 769.

But a claim does not "arise out of a contract," as Vertical seems to argue, "simply because the dispute would not have arisen absent the existence of the contract" with the arbitration clause. *Mackey v. Schooler's Constr., L.L.C.*, 640 S.W.3d 792, 798 (Mo. App. W.D. 2022). When the claim is "independent of the contract terms [in the contract requiring arbitration] and does not require reference to the underlying contract, arbitration is not required." *Id.* (quoting *St. Louis Reg'l Convention v. Nat'l Football League*, 581 S.W.3d 608, 617 (Mo. App. E.D. 2019)). In *Mackey*, the tort claim based on defective workmanship was subject to arbitration because it was a claim "arising out of or relating to" the parties' warranty contract and "the central issue" in the claim was "the same issue" covered by the warranty. *Id.* at 797, 799; *see also Greenwood v. Sherfield*, 895 S.W.2d 169, 175 (Mo. App. S.D. 1995) (holding that a claim that "neither invokes nor needs to invoke" the contract requiring arbitration did not "arise out of" or relate to that contract).

The situation between Disruption and Vertical is quite different from that in *Johnson* and *Mackey*. For example, unlike the arbitration agreement in *Johnson*, which was separate and expressly applied to any part of the sale transaction and specifically included the financing aspect, the Operating Agreement's arbitration clause in this case is limited to disputes about the Operating Agreement, which is focused on the operation and governance of Vertical. The Operating Agreement does not discuss how Disruption or

8

any other member obtained its ownership units—whether by loan, contribution, or otherwise. Although it appears that Disruption obtained its ownership units in Vertical as a result of making the Loan Agreement, it is the Subscription Agreement—not the Operating Agreement—that effected the transfer of those units. Moreover, the Subscription Agreement specifically provided that the Loan Agreement was "issued to [Vertical] pursuant to the terms of the . . . Subscription Agreement"—not the Operating Agreement. Thus, the Loan Agreement was most closely tied to the Subscription Agreement.

The Loan Agreement has nothing to do with the operating or governance of Vertical, just as the sales contracts in *Arizon* had nothing to do with protecting the parties' confidential information. It contains no arbitration clause and no incorporation by reference to the Operating Agreement's arbitration clause. The Loan Agreement makes no mention of the Operating Agreement at all. The Subscription Agreement mentions the Operating Agreement, but only as to the transfer of ownership units complying with the Operating Agreement (in ¶4(j) of the Subscription Agreement) and as to owners of units having no legal impediment to being bound by the Operating Agreement (in ¶4(p)).

There is no dispute that Disruption, having signed the Operating Agreement, is bound by its terms. But its terms include an arbitration clause that covers only disputes "arising out of or in connection with" the Operating Agreement. Nothing in the record supports that Disruption consented to binding arbitration of disputes arising under the

9

Loan Agreement, and the dispute raised in Disruption's lawsuit is not one that arose out of or is connected with the Operating Agreement. Point I is denied.

## Conclusion

Because the arbitration clause in Vertical's Operating Agreement did not apply to disputes about the Loan Agreement, we affirm the circuit court's denial of Vertical's motion to compel arbitration.

_____
Karen King Mitchell, Judge

W. Douglas Thomson, Presiding Judge, and Thomas N. Chapman, Judge, concur.