**CLEAN the UNIFORM COMPANY ST. LOUIS, Plaintiff/Respondent,**

**v.**

**MAGIC TOUCH CLEANING, INC., Defendant/Appellant.**

**No. ED 92657.**

Missouri Court of Appeals, Eastern District, Division One.

Dec. 29, 2009.

Mark D. Murphy, Jeffrey M. Cook, The Murphy Law Firm, LLC, Overland Park, KS, for appellant.

Henry F. Luepke, The Stolar Partnership LLP, St. Louis, MO, for respondent.

KATHIANNE KNAUP CRANE, Presiding Judge.

Plaintiff supplier filed a lawsuit against defendant customer to recover damages for breach of contract. After a bench trial, the trial court entered judgment in plaintiff's favor, awarding $19,011.80 in damages and $10,433.36 in attorney's fees. Defendant appeals. We affirm.

On March 17, 2006, defendant, Magic Touch Cleaning, Inc. (Customer), entered into a thirty-six-month rental service agreement (the Service Agreement) with plaintiff, Clean the Uniform Company St. Louis (Supplier), an industrial launderer located in St. Louis, Missouri. In the Service Agreement, Supplier agreed to provide Customer with shop towels, dust mops, and wet mops on a weekly basis, at rental charges specified in the Service Agreement. Customer agreed to accept all of its requirements for these items only from Supplier. The Service Agreement required Customer to accept and pay each week for a minimum of 50% of the inventory shown as issued, and pay the rental charges for the number of items accepted. Paragraphs 8, 9, and 10 of the Service Agreement provided:

8. Customer acknowledges that Customer's early cancellation of this Agreement will damage Supplier in an amount that is difficult to estimate or calculate accurately. Therefore, in the event of such early cancellation, Customer shall pay Supplier 50% of the average of the weekly rental charges during the preceding 26 weeks (or such lesser number of weeks as have actually elapsed during the term, or, if service has not commenced, the anticipated initial weekly billing) times the number of weeks remaining in the balance of the term, plus all

other due and unpaid charges. Customer hereby represents and admits that the amount to be paid under this paragraph 8 are a reasonable forecast of Supplier's actual losses resulting from Customer's early cancellation and are not a penalty. Customer consents to jurisdiction and venue in the County of Supplier's Office. Customer shall be liable to Supplier for all attorneys' and expert witness' fees, expenses and costs incurred in any lawsuit arising out of this Agreement.

9. This Agreement shall be suspended in the event of interruption of service due to strikes, lockouts, and causes beyond Customer's or Supplier's control that affect Customer's or Supplier's business.

10. This Agreement contains the entire understanding of the parties. No representations, warranties, promises or inducements, oral or written, not specifically set forth in this Agreement shall be binding on any of the parties. This Agreement can be amended only in writing signed by both parties. This Agreement is binding upon any successors to the businesses of the respective parties, and the respective parties shall so inform any such successor. Suppliers may assign this Agreement without the consent of Customer. On such assignment being made, Supplier is relieved from any liability which may arise.

At the time Customer entered into the Service Agreement, it was also a party to a one-year janitorial contract with the VA Hospital in St. Louis, Missouri, which had four one-year renewal options. On December 30, 2006, Customer's contract with the VA Hospital expired, and the VA Hospital did not renew it. Customer contacted Supplier and told Supplier it no longer needed Supplier's services because Customer was no longer cleaning the VA Hospital. Supplier stopped providing the service, and Customer stopped making payments.

Thereafter, in April 2007, Supplier filed a lawsuit against Customer to recover a past-due amount, liquidated damages for early cancellation, and attorney's fees. At the bench trial, Supplier adduced evidence that Customer owed Supplier $2,567.45 for services received, and that the amount of liquidated damages calculated under paragraph 8 of the Service Agreement, based on a percentage of the average weekly rental charges and the number of weeks left in the term of the Service Agreement, was $16,444.35. Supplier's counsel testified that his firm's fees for legal services provided in the case were $10,433.36. The trial court entered judgment for Supplier in those amounts.

## DISCUSSION

### Standard of Review

In this court-tried case, we will affirm the trial court's judgment unless there is no substantial evidence to support it, unless it is against the weight of the evidence, or unless it erroneously declares or misapplies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). We defer to the trial court on factual issues " 'because it is in a better position not only to judge the credibility of witnesses and the persons directly, but also their sincerity and character and other trial intangibles which may not be completely revealed by the record.' " *Essex Contracting, Inc. v. Jefferson County*, 277 S.W.3d 647, 652 (Mo. banc 2009) (quoting *In re Adoption of W.B.L.*, 681 S.W.2d 452, 455 (Mo. banc 1984)). If the trial court does not make findings of fact on a disputed issue, we

assume it has resolved the factual dispute in accord with its judgment. *KC Excavating and Grading v. Crane Const.*, 141 S.W.3d 401, 404–05 (Mo.App.2004).

*Preservation of Error*

■■■■ An appellant must properly raise errors in the appellate court in order for them to be reviewable. *See* Rule 84.13(a), which provides:

> Apart from questions of jurisdiction of the trial court over the subject matter and questions as to the sufficiency of pleadings to state a claim upon which relief can be granted or a legal defense to a claim, allegations of error not briefed or not properly briefed shall not be considered in any civil appeal and allegations of error not presented to or expressly decided by the trial court shall not be considered in any civil appeal from a jury tried case.

Rule 84.04 contains the requirements for an appellate brief. Compliance with this rule is mandatory "so that unnecessary burdens are not imposed on the appellate court and to ensure that appellate courts do not become advocates for the appellant." *Rothschild v. Roloff Trucking*, 238 S.W.3d 700, 701 (Mo.App.2007).

■■■■ Rule 84.04(i) requires all factual assertions in the argument be supported by references to the record on appeal. *See Pattie v. French Quarter Resorts*, 213 S.W.3d 237, 240 (Mo.App.2007). " 'References to the record on appeal in the argument portion of the brief provides us the tool with which to verify the accuracy of the factual assertions in the argument upon which a party relies to support its argument.' " *Id.* (quoting *Shaw v. Raymond*, 196 S.W.3d 655, 659 n. 2 (Mo.App. 2006)). In the absence of the required references to the record on appeal, the verification process "would require us to search the record to find what we deem supports [an appellant's] factual asser-

tions." *Shaw*, 196 S.W.3d at 659 n. 2. "This would effectively thrust us into the role of an advocate for [the appellant], a role we cannot take." *Id.* An appellant's failure to comply with Rule 84.04(i) denies us the ability to provide verifiable appellate review, and, therefore justifies our decision to decline to review the point of error for that argument. *Id.*

In this case, Customer has not provided references to the record on appeal to support any statement of fact or procedure in the argument portions of its brief under Points I, II, and III, and only one reference to the record under Point IV. While this would justify dismissal of the appeal, we have elected to review points I, II, and IV on the merits because these points are not so fact-dependent that review without the required references to the record on appeal is largely frustrated. However, Customer's argument under Point III is very fact-dependent, and without the required references to the record, we decline to review Point III on the merits.

## I. SUSPENSION CLAUSE

■■■■ In its first point, Customer contends that the trial court erred in concluding that Customer breached the Service Agreement. Customer argues that its loss of its contract with the VA Hospital constituted an interruption of service due to causes beyond Customer's control that affected Customer's business, which caused the Service Agreement to be suspended under paragraph 9 of the Service Agreement. Customer's argument is based on two premises, that an event covered under paragraph 9 occurred and that "suspend" as used in paragraph 9 includes a termination of the Service Agreement. We do not reach the issue of the meaning of "suspend," because the non-renewal of the VA Hospital contract was not an event

covered under paragraph 9 of the Service Agreement.

To support its argument that an event covered under paragraph 9 occurred, Customer reasons that the non-renewal of its VA Hospital contract was a "bargained-for contingency" triggering the suspension of the Service Agreement under paragraph 9. It contends that it did not control whether the VA Hospital contract would be renewed and that the parties intended that the risk of non-renewal would be included in the "causes beyond [the parties'] control" language in paragraph 9 of the Service Agreement. We disagree.

At the time it entered into the Service Agreement, Customer knew that its VA Hospital contract would terminate after one year and would have to be renewed. However, the parties did not refer to the VA Hospital contract in the Service Agreement. Further, the parties did not expressly make the Service Agreement subject to suspension or cancellation if the VA Hospital contract was not renewed, although the Service Agreement did expressly list other events, namely, "strikes" and "lockouts," that would cause suspension. Finally, although Customer negotiated the length of the term of the Service Agreement and changed the original term to a shorter term by interlineation, Customer agreed to a term that went at least two years beyond the end of the initial term of the VA Hospital contract. As explained below, in these circumstances the non-renewal of the VA Hospital contract was a reasonably foreseeable risk at the time of contracting that did not excuse Customer's performance under the Service Agreement because it was not expressly set out as such in the Service Agreement.

As a general matter, if a party to a contract wants its performance to be excused upon the happening of an event arising after the formation of a contract, which event reasonably could be foreseen at the time of contracting, that party must expressly provide for that contingency in the contract, even if that event would render performance impossible, impractical, or commercially-frustrated. *See Minor v. Rush,* 216 S.W.3d 210, 213–14 (Mo.App. 2007); *Adbar, L.C. v. New Beginnings C-Star,* 103 S.W.3d 799, 801–02 (Mo.App. 2003); *Missouri Dept. of Transp. ex rel. v. Safeco,* 97 S.W.3d 21, 35 (Mo.App.2002); *Werner v. Ashcraft Bloomquist, Inc.,* 10 S.W.3d 575, 577–78 (Mo.App.2000). *See also* 30 RICHARD A. LORD, WILLISTON ON CONTRACTS §§ 77:11, 77:54, 77:95 (4th ed.2004); 17A AM.JUR.2D *Contracts* §§ 653, 659 (2004). An event that reasonably could have been anticipated at the time of contracting does not excuse the obligor's performance under these doctrines because if the event reasonably could be foreseen and the contract does not provide for performance to be excused if the event occurs, we presume that the parties intended the obligor to assume this risk. *Adbar,* 103 S.W.3d at 801; *Werner,* 10 S.W.3d at 577. *See also* 17A AM.JUR.2D *Contracts, supra,* §§ 653, 659; LORD, *supra,* §§ 77:54, 77:95; RESTATEMENT (SECOND) OF CONTRACTS § 261 cmt. e (1981).

*Werner* illustrates the application of these principles to a situation in which a defendant claims to be excused from performing its contract with a plaintiff because the defendant has lost a contract with a third party. In *Werner,* the defendant contractor entered into a contract with an owner to remodel a shopping center, pursuant to which existing signage would be removed and reinstalled. The defendant thereafter entered into a subcontract with the plaintiff subcontractor to remove and reinstall all existing signage in the shopping center. The owner subsequently entered into a change order with the defendant that deleted the reinstalla-

tion of the signs, and the defendant advised the plaintiff it was discontinuing its subcontract with the plaintiff. The plaintiff filed a lawsuit to recover damages for breach of contract. In affirming the judgment in the plaintiffs favor, we rejected the defendant's argument that the owner's change order eliminating the sign reinstallation work excused the defendant's performance of its contract with the plaintiff for reinstallation under the doctrines of impossibility of performance and/or commercial frustration.

In our opinion, we first considered the doctrine of impossibility of performance. 10 S.W.3d at 577. This doctrine derives from

> the general rule that when a person by his contract charges himself with an obligation possible to be performed, *he must perform it*, unless its performance is rendered impossible by the act of God, by the law, or by the other party. In case a party desires to be excused from performance in the event of contingencies arising, it is his duty to provide therefor in his contract.

*Stein v. Bruce*, 366 S.W.2d 732, 734 (Mo. App.1963). We held that the owner's change order was not the type of unexpected event that would warrant consideration of this doctrine; the defendant had not provided in its subcontract with the plaintiff for termination in the event that the owner entered a change order deleting the work; and given the nature of the subcontract and surrounding circumstances, the defendant assumed the risk of the owner entering a change order because the defendant was in a better position to anticipate the risk that its contractee, the owner, would enter a change order. 10 S.W.3d at 577. We concluded that the defendant's failure to make a provision for the contingency of a change order in its contract with the plaintiff "indicated its

assumption of the risk that a change order might occur which could impair its contract with [the plaintiff]." *Id.*

We next addressed the doctrine of commercial frustration. *Id.* This doctrine provides that "if the happening of an event not foreseen by the parties and not caused by or under the control of either party has destroyed or nearly destroyed either the value of the performance or the object or purpose of the contract, then the parties are excused from further performance." *Id.* "[I]n cases of commercial frustration, performance remains possible but the expected value of performance in the party seeking to be excused has been destroyed by the fortuitous event" that supervenes. *Id.* However, if the supervening event was reasonably foreseeable, "the parties should have provided for its occurrence in the contract and the absence of such provision indicates an assumption of risk by the promisor." *Id.* We held that the defendant's performance was not excused under this doctrine because the possibility of the owner entering a change order that could impair performance under the defendant's subcontract with the owner was reasonably foreseeable to the defendant and it failed to provide for that contingency in its contract with the plaintiff. *Id.* at 578.

Here, Customer did not expressly include in the Service Agreement the contingency that the VA Hospital contract would not be renewed after the first year. Customer knew its VA Hospital contract had a one-year term and would have to be renewed. The VA Hospital's non-renewal of its contract with Customer was reasonably foreseeable, and in fact, the evidence disclosed that Customer did foresee the possibility of that event at the time of contracting. Under these circumstances, Customer assumed the risk that its contract with the VA Hospital might not be renewed after its one-year term and was

required to expressly list this contingency in the Service Agreement to be excused from performance upon non-renewal if it did not intend to assume the risk of non-renewal.

■ Customer argues that this contingency was covered in the "causes beyond [the parties'] control" language in paragraph 9. Paragraph 9 suspends performance for named risks and unspecified causes beyond the parties' control. As such, it is akin to a *force majeure* or other escape clause. A *force majeure* clause is a "contractual provision allocating the risk if performance becomes impossible or impracticable, esp. as a result of an event or effect that the parties could not have anticipated or controlled." BLACK'S LAW DICTIONARY 718 (9th ed.2009). Parties typically address the risk of supervening events in a *force majeure* or other escape clause. *See* LORD, *supra*, § 74.19. The purpose of a general, catch-all phrase, such as "causes beyond [the parties'] control," in a *force majeure* or escape clause is to relieve a party of liability when the parties' expectations are frustrated due to an "unforeseeable occurrence" beyond the parties' control. LORD, *supra*, § 77:31. *See also*, 14 JAMES P. NEHF, CORBIN ON CONTRACTS § 74.19 (2001). Thus, foreseeable events are not encompassed in the catch-all provisions of such a clause and remain subject to the requirement that they must be expressly set out in a contract to relieve a party of liability.

Here, the non-renewal of the VA Hospital contract was not expressly listed in paragraph 9, and it is not encompassed by the "causes beyond [the parties] control" language in paragraph 9 because the purpose of that language is to relieve a party from an unforeseeable occurrence, NEHF, *supra*, § 74.19, and the non-renewal of the VA Hospital contract was not only reasonably foreseeable, but actually foreseen.

■ Further, the principle of *ejusdem generis* also defeats the argument that the non-renewal was covered by the general language of paragraph 9. When the event that prevents performance is not enumerated in the *force majeure* or escape clause, but the clause lists specific events followed by a general catch-all phrase, it is appropriate to apply the precept of *ejusdem generis*. 17A AM.JUR.2D *Contracts, supra*, § 664. This precept holds that "[g]enerally, when words of general description are used in connection with a specific enumeration of articles, the general description will include only articles similar to those specifically mentioned." *West v. Nichols*, 227 S.W.2d 760, 762 (Mo.App.1950). Neither of the specifically-enumerated events in paragraph 9, strikes and lockouts, are similar in nature to the VA Hospital's non-renewal of its contract with Customer. Accordingly, the principle of *ejusdem generis* does not allow the non-renewal to be covered by paragraph 9.

In *Scullin Steel Co. v. Mississippi Valley Iron Co.*, 308 Mo. 453, 273 S.W. 95, 98 (1925), the Missouri Supreme Court held, in conformity with the principles set out above, that when the parties did not expressly make a contract terminable upon the happening of a foreseeable risk at the time of contracting (the failure to obtain a raw material necessary to perform the contract), that contingency was not covered by a non-liability clause that was applicable to "interruption of service due to strikes, lockouts, and causes beyond [the defendant's] control." *Id.* at 98. In *Scullin Steel*, the defendant agreed to deliver pig iron in a contract that contained the following clause: "We shall not be liable in damages for failure to deliver caused by strikes, accidents or other causes beyond our control." The defendant failed to deliver the pig iron. The issue before the court was whether the

delay was within one or more of the conditions enumerated in the non-liability clause. *Id.* at 100. The trial court excluded evidence that the defendant failed to deliver the pig iron because it did not have a sufficient supply of coke to manufacture the pig iron. On appeal, the Missouri Supreme Court held that the defendant's failure to procure the coke did not fall within the clause of the contract exempting the defendant from liability for the listed causes or other causes beyond its control. *Id.* at 102. It explained:

> In the case at bar, the defendant must be held to have assumed the risk of procuring in advance by contractual arrangement, from any source available, a material necessary to its purpose. If the party with whom defendant contracted failed to comply with his contract, that was not a result due to accident or to strikes or to causes which can be held to be within the terms of the contract under consideration.

*Id.* Likewise, in this case, Customer is held to have assumed the risk that its one-year contract with the VA Hospital would not be renewed because this risk was not expressly listed in the Service Agreement as an event that would cause the Service Agreement to be suspended and cannot be read into the "causes beyond [the parties'] control" language of paragraph 9.

 Finally, Customer argues that it relied on Supplier's oral representation that paragraph 9 would allow termination of the Service Agreement if the VA Hospital contract was not renewed. Customer cannot rely on oral representations that were not included in the written Service

Agreement because "[t]he law conclusively presumes all prior and contemporaneous agreements have been merged" into a written contract, and that written contract becomes the "final memorial of the agreement." *Union Elec. Co. v. Fundways, Ltd.,* 886 S.W.2d 169, 170 (Mo.App.1994). This rule is particularly applicable when, as here, the Service Agreement contained an integration clause providing that "[n]o representations, warranties, promises or inducements, not oral or written, not specifically set forth in this Agreement shall be binding on any party." *See id.* at 170–71.[1]

For all of the above reasons, the trial court did not err in concluding that Customer breached the Service Agreement, and that the non-renewal of the VA Hospital contract did not excuse Customer's performance. Point one is denied.

## II. *FIRST TO BREACH*

 In its second point, Customer asserts that the trial court erred in concluding that Customer breached the Service Agreement because the evidence established that Supplier was actually the breaching party in that the Service Agreement did not specify the place of performance, Customer requested service from Supplier in Lee's Summit, Missouri after its contract with the VA Hospital was not renewed, and Supplier did not perform there.

 This point has no merit. Customer asserted as an affirmative defense that "[Supplier's] claim is barred, in whole or in part, by [Supplier's] prior breaches of contract." This allegation is wholly concluso-

1. Notwithstanding this rule, the trial court heard extrinsic evidence on the parties' intentions on whether the Service Agreement was contingent on the renewal of the VA Hospital contract, and it concluded that the credible evidence did not suggest it was. It further

stated it "does not find it credible that there were additional agreements that would have changed the entire character of the Agreement that were not put in writing as the evidence indicates otherwise."

ry, *Trotter's Corp. v. Ringleader Restaurants,* 929 S.W.2d 935, 939 (Mo.App.1996), and Customer did not plead facts in support of this defense, violating Rule 55.08. "A pleading that makes a conclusory statement and does not plead the specific facts required to support the affirmative defense fails to adequately raise the alleged affirmative defense, and the alleged affirmative defense fails as a matter of law." *Eltiste v. Ford Motor Co.,* 167 S.W.3d 742, 752 (Mo.App.2005).

 Moreover, this defense was not tried by consent. The "first to breach" rule provides that a party to a contract cannot claim its benefits if he or she is the first to violate it. *R.J.S. Sec., Inc. v. Command Sec. Services,* 101 S.W.3d 1, 18 (Mo. App.2003); *Forms Mfg. Inc. v. Edwards,* 705 S.W.2d 67, 69 (Mo.App.1985). Whether a plaintiff has unilaterally breached the contract before a defendant breaches it is a question of fact. *Forms Mfg.,* 705 S.W.2d at 69. Here, both parties adduced evidence showing that Customer was the first to breach the Service Agreement. Supplier's employee testified that Customer contacted Supplier and told Supplier it no longer needed Supplier's services because it was no longer cleaning the VA Hospital. Customer's CEO and chairman testified that he told Supplier that "we no longer had business in St. Louis and that we could not continue with them. We had no reason to." There was no evidence Supplier did anything to breach the Service Agreement before Customer told Supplier it no longer needed its services. Without such evidence, the issue could not have been tried by consent.

Further, even if the issue had been tried by consent, the trial court's judgment in Supplier's favor constitutes an implied rejection of Customer's additional evidence that after informing Supplier that it no longer needed its services, it offered to accept Supplier's services in Lee's Summit, Missouri, and Supplier did not provide them.

The trial court did not err in not finding Supplier was the first to breach the Service Agreement. Point two is denied.

## III. *ATTORNEY'S FEES*

For its final point, Customer maintains that the trial court erred when it awarded attorney's fees to Supplier because the evidence submitted in support of the award was insufficient and the amount of attorney's fees was unreasonable. It also asserts that the court improperly considered evidence submitted in support of the request for attorney's fees after the completion of the trial, and Customer was not given a full and fair opportunity to respond to that material.

 If a contract provides for the payment of attorney's fees and expenses incurred in the enforcement of a contract provision, the trial court must comply with the terms of the contract and award them to the prevailing party. *Sheppard v. East,* 192 S.W.3d 518, 523 (Mo.App.2006). We consider the trial court to be an expert on the amount of attorney's fees to be awarded. *Essex Contracting,* 277 S.W.3d at 656. "[T]he court that 'tries a case and is acquainted with all the issues involved may fix the amount of attorneys' fees without the aid of evidence.'" *Id.* (quoting *Nelson v. Hotchkiss,* 601 S.W.2d 14, 21 (Mo. banc 1980)) (all other internal citations omitted). The determination of the amount of attorney's fees is within the sound discretion of the trial court, and we will not reverse unless the award is arbitrarily arrived at or is so unreasonable that it indicates indifference and a lack of proper judicial discrimination. *Id.* at 656–57.

At trial, Supplier's counsel offered his affidavit of attorney's fees into evidence.

The trial court sustained Customer's objection to the affidavit based on lack of foundation. Supplier then called another of its attorneys to testify to the amount of attorney's fees. That attorney testified to the scope of the work performed and testified that the total amount of attorney's fees was $10,433.36. During cross-examination, Customer's counsel asked if that attorney could produce detailed time statements supporting the fee amount. Because that attorney did not have those records in court, Customer's counsel moved to strike that attorney's testimony. The trial court denied the motion, but asked Supplier to supplement the record. Customer did not object to this procedure. At the conclusion of the trial, the court announced: "Nothing further, the Court will take the case heard and submitted and issue a written opinion after receiving your records." Again, Customer did not object to the court's post-trial review of the records or request an opportunity to respond.

■ Customer first argues that the testimony was insufficient to establish Supplier's attorney's fees because it did not establish that Supplier had actually been charged or had paid that amount in attorney's fees. Customer also argues the award is excessive because (1) Supplier's attorneys "spent an unreasonable number" of hours on the litigation; (2) it was not necessary for Supplier to be represented by two attorneys at trial; and (3) the amount awarded in attorney's fees represented more than half of the total amount demanded by Supplier.

■ These arguments have no merit. In the absence of contrary evidence, " 'the trial court is presumed to know the character of services rendered in duration, zeal and ability.' " *Essex Contracting*, 277 S.W.3d at 656–57 (quoting *Nelson*, 601 S.W.2d at 21) (internal citations omitted). Whether the amount requested was, in fact, billed or paid is a factor that a trial court can consider in determining whether the litigation itself was reasonable. *Next Day Motor Freight, Inc. v. Hirst*, 950 S.W.2d 676, 680 (Mo.App.1997). The reasonableness of the number of hours spent preparing for trial, the necessity of two attorneys at trial, and the value of the services are all issues for the trial court to resolve in determining a reasonable attorney's fee award. *Union Center Redev. Corp. v. Leslie*, 733 S.W.2d 6, 9–10 (Mo.App.1987). We defer to the trial court's discretion to resolve each of these issues. The trial court did not clearly abuse its discretion in determining $10,433.36 to be the reasonable amount of Supplier's attorney's fees.

■ Next, Customer argues that he was prejudiced because the court reviewed the material documenting the fees after trial. The record on appeal does not contain any documents that were reviewed, or even indicate that the court did review supplementary material after trial. Since the court's action and these records are not part of the trial record, this claim of error is not before us. *Eaton v. Eaton*, 637 S.W.2d 799, 800 (Mo.App.1982); *Stix & Co., Inc. v. First Mo. Bank & Tr. Co., Etc.*, 564 S.W.2d 67, 69 (Mo.App.1978); *State v. Matthews*, 512 S.W.2d 248, 249 (Mo.App.1974). "Matters not transcripted may not be considered on appeal, even though viewed by the trial court in Chambers." *Matthews*, 512 S.W.2d at 249 (internal citation omitted). Furthermore, Customer did not object when the trial court asked Supplier to supplement the record with materials. For this additional reason, Customer has not preserved this argument for review. *Catroppa v. Metal Bldg. Supply, Inc.*, 267 S.W.3d 812, 816 (Mo.App.2008).

■ Finally, Customer challenges the fee award by taking the position that Supplier was required to comply with section

490.525 RSMo (2000), but did not do so. Customer did not raise this argument in the trial court, thus failing to preserve it for our review. *Don King Equip. v. Double D Tractor Parts,* 115 S.W.3d 363, 371 (Mo.App.2003).

The trial court did not abuse its discretion in computing the amount of attorney's fees awarded to Supplier. This point is denied.

### ATTORNEY'S FEES ON APPEAL

Supplier has moved for attorney's fees on appeal. We may award attorney's fees on appeal "if they are based on a written agreement that is the subject of the issues presented in the appeal." *SE Co–Op Service Co. v. Hampton,* 263 S.W.3d 689, 696 (Mo.App.2008) (quoting *American Nat. v. Noble Communications,* 936 S.W.2d 124, 134 (Mo.App.1996)). Here, the Service Agreement provided for recovery of attorney's fees incurred in a lawsuit arising out of the Service Agreement, and all of the issues on appeal related to the Service Agreement. The trial court is better equipped to hear evidence and argument on this request than we are. Therefore, we remand to the trial court to conduct a hearing to determine and award reasonable attorney's fees incurred on appeal by Supplier.

*Conclusion*

The judgment of the trial court is affirmed. The case is remanded to the trial court with directions to conduct a hearing to hear evidence and determine the reasonableness of the attorney's fees incurred on appeal by Supplier, and to enter judgment accordingly.

CLIFFORD H. AHRENS, J. and NANNETTE A. BAKER, J., concur.