Harold L. LaRUE, Appellant,

v.

**Linda ALCORN and Trans–Central Suppliers, Inc., Respondents.**

No. WD 74749.

Missouri Court of Appeals, Western District.

Dec. 11, 2012.

216

Thomas Schneider, Columbia, MO, for Appellant.

Mark Kempton, Sedalia, MO, for Respondents.

Before JAMES EDWARD WELSH, C.J., MARK D. PFEIFFER, J., and DEBORAH DANIELS, Sp. J.

JAMES EDWARD WELSH, Chief Judge.

Harold L. LaRue appeals the circuit court's judgment[1] in favor of Linda Alcorn and Trans–Central Suppliers, Inc. (hereinafter and collectively "Respondents"). LaRue asserts three points on appeal. First, LaRue claims that the court erred in denying his request to dissolve Trans–Central Suppliers, Inc., (Trans–Central) pursuant to section 351.467, RSMo 2000, contending that the statute mandates dissolution and supersedes the corporate shareholder agreement. Second, LaRue claims that the court erred in entering judgment in favor of Respondents and enforcing the corporate shareholder buyout agreement, contending that the buyout provision was not triggered by the termination of La-Rue's employment because the corporation president had no authority to terminate LaRue. Third, LaRue claims that the court erred in entering judgment for Respondents and concluding that his termination for improper competition was appropriate, contending that the *sua sponte* conclusion of the court was a misstatement or misapplication of the law and there was no substantial and competent evidence to support that LaRue engaged in "improper means" when he loaned money and furnished equipment to a competing company. We affirm the circuit court's judgment.

Trans–Central was incorporated in Missouri on July 23, 1975. Prior to incorporation, a Shareholder Agreement was executed and thereafter amended on August 23, 1994. The Shareholder Agreement reads, in part:

1. Though not clear from the briefs, the parties explained at oral argument that they submitted for the court's determination the question of whether section 351.467 prevailed over the shareholder agreement, which resulted in the court issuing a partial summary judgment on that issue, but thereafter heard evidence on other disputed matters and ultimately issued a final judgment.

Whereas, the Corporation's business is such that it is to its best interests that its Shares be owned by persons who are active in the business of the Corporation, and the Corporation and Shareholders desire to provide for continuity and harmony in the management of the Corporation.... Now the Shareholders and the Corporation agree, as follows.... Upon termination of employment by the Corporation of any Shareholder other than by death or disability, the Shareholder whose employment has terminated shall sell and the Corporation shall buy all the shares own[ed] by such Shareholder for the price established under Section 7 herein and upon the terms hereinafter provided.... For purposes of this Agreement, 'termination of employment' means the severance of the employment relation between the Shareholder and the Corporation either by resignation, retirement, dismissal for cause, dismissal without cause, dismissal for lack of work or change in operations.

When LaRue filed his petition on September 28, 2010, to dissolve Trans–Central, LaRue and Alcorn, formerly husband and wife, each owned fifty percent of the corporate stock of Trans–Central. In addition to owning fifty percent of the company, LaRue was a director as well as vice president of the corporation. For approximately nine years, from 2000 to June of 2009, he was also employed by Trans–Central and his duties included, among other things, cleaning, test-driving trucks, making deliveries, and retrieving parts. Alcorn became president of the corporation in 1985 and hired and fired various employees of Trans–Central during her tenure.

In April of 2009, Alcorn terminated Wyatt Lea's employment as shop foreman with Trans–Central due to alleged customer complaints. On or about June 2, 2009, Alcorn terminated Robert Lea's and Austin Lea's employment with Trans–Central because they failed to show up for work. LaRue disagreed with the terminations of Wyatt, Robert, and Austin Lea. In April of 2009, when Alcorn fired Wyatt Lea as shop foreman, LaRue began negotiating with Alcorn to purchase her portion of Trans–Central. LaRue discussed with Wyatt Lea his desire to buy Alcorn out and then rehire Wyatt upon doing so. LaRue, however, was unable to obtain financing. Thereafter, in May of 2009, LaRue discussed starting Lea's Truck Service with Robert Lea. LaRue was aware that Lea's Truck Service would be located a couple of blocks from Trans–Central, that it would be engaging in the same type of business as Trans–Central, and that it would be servicing the same type of customer. On June 10, 2009, LaRue secured a loan for nearly $100,000. On June 11, 2009, LaRue gave Robert Lea a check for $80,000 for the start of Lea's Truck Service. Thereafter, he purchased and gifted equipment to the business. Lea's Truck Service opened for business on June 15, 2009. On June 30, 2009, Alcorn fired LaRue, accusing LaRue of having an ownership interest in Lea's Truck Service. At that time, LaRue remained a director, vice-president, and shareholder of Trans–Central.

Over one year later, on September 28, 2010, LaRue petitioned the court for corporate dissolution of Trans–Central. On December 2, 2010, Alcorn notified LaRue that LaRue's shares in Trans–Central would be purchased by Trans–Central pursuant to the terms of the August 23, 1994 Shareholder Agreement. Alcorn's notice provided a date, time, and location for finalization of the transaction. On December 13, 2010, LaRue filed an amended petition praying for dissolution of Trans–Central pursuant to section 351.467, con-

tending, in part, that LaRue and Alcorn were each 50 percent shareholders of Trans–Central, that they were unable to agree on the desirability of continuing the business, and therefore, that the corporation must be dissolved. Alcorn answered LaRue's petition by, in part, denying that LaRue and Alcorn were unable to agree on the desirability of continuing the business and asserting that LaRue's claim for dissolution was precluded by the Shareholder Agreement.

■ Review of this court tried case is governed by *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). We will affirm the circuit court's judgment unless it is unsupported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law. *Id.*

■ In his first point on appeal, LaRue claims that the court erred in denying his request to dissolve Trans–Central pursuant to section 351.467. He contends that the statute mandates dissolution and supersedes Trans–Central's Shareholder Agreement. We disagree.

■ Section 351.467 provides for judicial dissolution of a corporation consisting of two equal shareholders if the shareholders are "unable to agree upon the desirability of continuing the business of [the] corporation." LaRue, Alcorn, and the other previous shareholders of Trans–Central executed a Shareholder Agreement that was amended on August 23, 1994. The Shareholder Agreement, as set forth above, created the buy-out provision for when an employee shareholder was terminated from employment, so as to provide for "continuity and harmony in the management of the Corporation." There were only four shareholders in the corporation

when this agreement was initiated: Harold LaRue, Linda Alcorn, Robert Bahner, and Pamela Bahner.[2] By entering into this agreement, LaRue understood that, if his employment was terminated by Trans–Central for any reason other than by death or disability, this buyout provision would be triggered and he would be bound by it. "It is the most basic principle of contract law that parties are bound by the terms of the contracts they sign and courts will enforce contracts according to their plain meaning, unless induced by fraud, duress, or undue influence." *Nitro Distributing, Inc. v. Dunn*, 194 S.W.3d 339, 349 (Mo. banc 2006). The Shareholder Agreement anticipated the potential deadlock and provided a solution that insured the corporation's continued existence obviating the need for dissolution. The mere fact that LaRue now wishes to renege on the agreement in no way creates an actual inability to continue the business of the corporation. Therefore, section 351.467 is inapplicable because the corporate Shareholder Agreement represents an agreement between the two equal shareholders regarding continuing the business of the corporation under the circumstances of this case.

Additionally, the uncontroverted facts are that, in April of 2009, LaRue negotiated with Alcorn to purchase her portion of Trans–Central but was unable to obtain financing. Therefore, up until LaRue filed for dissolution under section 351.467, claiming that he and Alcorn were unable to agree on the desirability of continuing the business of the corporation, continuation of the business was never an issue, only which shareholder would continue the business. Also, on appeal LaRue states that, "in the course of the corporate dissolution, [he] may also be able to reacquire

---

**2.** In 1997, Trans–Central purchased Robert and Pamela Banner's shares, leaving LaRue and Alcorn each owning 50% of the shares of Trans–Central.

the company which he started in 1975." Reacquisition of the business suggests that LaRue still desires for the business to continue as long as he has ownership of it.

Therefore, not only does the Shareholder Agreement evidence a prior contract regarding continuation of the business under the circumstances presented here, but there is also no evidence that the desirability of continuing the business of the corporation was ever truly in dispute. Section 351.467 is not implicated.

LaRue characterizes Alcorn's termination of his employment as a "squeeze out" by Alcorn whereby she terminated LaRue's employment so that she could force him to sell his stock back to the corporation and become the sole shareholder. The record suggests otherwise. After LaRue was fired, the business of Trans–Central continued, and LaRue remained a director, vice-president, and 50% shareholder of the corporation. While Trans–Central immediately filed suit against LaRue for allegedly breaching his fiduciary duty to Trans–Central by financing and assisting a competing business,[3] the record reflects no attempts by Alcorn to buy LaRue's Trans–Central shares out under the Shareholder Agreement. It was one year later, and only after LaRue filed for dissolution of the corporation and discontinuation of the business, that Alcorn advised LaRue that Trans–Central would be enforcing the buy-out provision of the Shareholder Agreement.

We, therefore, conclude that the circuit court did not err in declining to dissolve Trans–Central pursuant to section 351.467. Point one is denied.

In his second point on appeal, LaRue contends that the circuit court erred in enforcing the Shareholder Agreement, claiming that the buyout provision of the agreement was not triggered because Alcorn, as president of the corporation, did not have the authority to fire him as a shareholder employee. We conclude that Alcorn had the authority to fire LaRue.

LaRue concedes that the corporation's by-laws do not address the hiring and firing of employees or employee shareholders but maintains that the Board of Directors reserved the authority to fire shareholder employees by not delegating the authority. Article III, Section 1 of Trans–Central's by-laws provide that "the business, property and affairs of the Corporation shall be controlled and managed by its Board of Directors." Article VI, Section 1 states that "the President shall supervise and control the business, property and affairs of the Corporation, subject to the authority hereinabove given to the Board of Directors" and that "[t]he President shall perform all duties incident to his office." While Sections 3 and 4 of Article V discuss removal and replacement of "[a]ny officer elected by the Board of Directors," the removal or firing of employees or employee shareholders is not discussed. As the by-laws are written, the president's authority is limited by "the authority hereinabove given to the Board of Directors." Therefore, the president cannot remove a corporate officer, because such authority is specifically granted to the Board of Directors. However, beyond the express authority designated to the directors, the by-laws place no additional limitations on the president's authority.

---

**3.** Respondents' brief indicates that, on July 10, 2009, Trans–Central sued LaRue for breach of fiduciary duty to the corporation arising from his actions in financing and assisting the Leas in starting the competing business and that the action is currently pending in the circuit court of Pettis County, Missouri.

Our Eastern District in *Kenney v. Emge*, 972 S.W.2d 616, 619 (Mo.App.1998), addressed an argument similar to LaRue's and found that the president, as Chief Executive Officer and the individual in charge of the day to day operations of the company, had the authority to terminate the employment of the other equal shareholder. Unlike here, in *Kenney* the corporation's by-laws addressed discharge of employees and stated that the Board had the authority to discharge or remove any employee and that the Board had the authority to delegate to the president or other officer the authority to discharge employees. *Id.* at 617. Nevertheless, the court disagreed with Kenney's argument that, per the by-laws, because the Board did not delegate the authority to the president to terminate Kenney's employment, the president had no authority to fire Kenney. *Id.* at 619. The court stated that "[n]umerous cases hold that a president of a corporation, without any special authority from the board of directors, may perform for the corporation all acts of an ordinary nature which, by usage or necessity are incident to his office." [4] *Id.* Ultimately, the court held that the president had the authority to terminate the employment of the other equal shareholder without approval from the Board of Directors. *Id.* The court noted that the president did

not terminate Kenney as an officer, but as an employee. *Id.*

Here, Alcorn, as president of the corporation, had the authority to terminate LaRue as an employee. LaRue remained an officer, director, and shareholder after his termination. The circuit court did not err in concluding that Alcorn had the authority to terminate LaRue. Point two is denied.

■ In his third point on appeal, LaRue contends that the court erred in entering judgment for Respondents to the extent that it found Alcorn legitimately terminated LaRue's employment because LaRue allegedly competed with Trans–Central. LaRue contends that the court's *sua sponte* conclusion was a misstatement or misapplication of the law because Missouri law permits corporate shareholders or directors to compete with a corporation as long as no improper means are used. He also asserts that no substantial and competent evidence supported the court's conclusion of improper means. We find that, as an at-will employee, LaRue was subject to termination without cause. Nevertheless, because LaRue alleges that his termination was a ruse to affect a corporate takeover, we address LaRue's allegation that Alcorn had no cause to fire him *ex gratia.* [5]

---

**4.** While the court did emphasize that the president was also the chief executive officer of the corporation in *Kenney,* our Supreme Court in *Sparks v. Despatch Transfer Co.,* 104 Mo. 531, 15 S.W. 417, 419 (1891), stated that "[t]he president of a business corporation is its chief executive officer." Therefore, we find unpersuasive LaRue's argument that *Kenney* is distinguishable because the president in *Kenney* was also the chief executive officer.

**5.** The case law referenced by LaRue and Respondents on this point regards tort or equitable claims for breach of loyalty or breach of fiduciary duty. *See Scanwell Freight Express*

*STL, Inc. v. Chan,* 162 S.W.3d 477, 478 (Mo. banc 2005), *Western Blue Print Co., LLC v. Roberts.,* 367 S.W.3d 7 (Mo. banc 2012), *National Rejectors, Inc. v. Trieman,* 409 S.W.2d 1, 7 (Mo.1966), and *Opie Brush Co. v. Bland,* 409 S.W.2d 752 (Mo.App.1966). Whether LaRue's conduct rose to the level of an actual breach of loyalty or fiduciary duty would not be an essential determination if it were necessary to decide whether his conduct warranted termination from his employment. Nevertheless, the requisite standards for sustaining a tortious breach of loyalty or fiduciary duty claim are instructive in examining conduct that might warrant termination from employment if cause was required for termination.

There is no dispute that Alcorn fired LaRue because she believed him to be involved in Lea's Truck Service, a competing business. She was correct. While still employed by Trans–Central and an officer and director and shareholder, LaRue financed the start of Lea's Truck Service and gifted equipment to the business. Lea's Truck Service was a competing business located two blocks down the street from Trans–Central. On the facts of this case, LaRue's actions constituted wanton, willful, intentional, and substantial disregard for Trans–Central's interests and his duties and obligations as an employee of Trans–Central.[6] Had LaRue not been an at-will employee, his disregard for Trans–Central's interests would have justified his termination, and the court did not err in concluding that LaRue's termination was legitimate.[7] Point three is denied.

We, therefore, conclude that the circuit court did not err in failing to dissolve Trans–Central pursuant to section 351.467. Section 351.467 is inapplicable as the Shareholder Agreement provides for continuing the business of the corporation under the circumstances in this case.

Further, the circuit court did not err in enforcing the buyout provision of the Shareholder Agreement. Alcorn, as president of the corporation, had the authority to terminate LaRue's employment, which triggered the buyout provision. Finally, the circuit court did not err in entering judgment for Respondents because it found LaRue's termination lawful. LaRue's status as an at-will employee subjected him to termination with or without cause. We affirm the circuit court's judgment.

All concur.

---

In addressing tort claims, our courts have concluded that "employees, while employed, must not act contrary to the employer's interests, including engaging in direct competition with the employer until their employment is terminated." *Western Blue Print Co., LLC*, 367 S.W.3d at 17. " 'A breach arises when the employee goes beyond the mere planning and preparation and actually engages in direct competition, which by definition, is to gain advantage over a competitor.' " *Id.* (quoting *Scanwell*, 162 S.W.3d at 479). "Activities that constitute a breach of the duty of loyalty in this respect include using confidential information peculiar to the employer's business, soliciting customers before the end of the employment or other acts that result in direct competition." *Id.*

6. Missouri courts have found that "misconduct" warranting termination from employment so as to disqualify an employee from unemployment includes:

[An] act of wanton or willful disregard of the employer's interest, a deliberate violation of the employer's rules, a disregard of standards of behavior which the employer has the right to expect of his employee, or negligence in such degree or recurrence as to manifest culpability, wrongful intent, or evil design or show an intentional and substantial disregard of the employer's interest or of the employee's duties and obligations to the employer.

*Hoover v. Community Blood Center*, 153 S.W.3d 9, 13 (Mo.App.2005) (internal citations and quotations omitted). As this definition pertains to employee misconduct such that would disqualify an individual from unemployment compensation, this represents a higher standard than what might be required of an employer to terminate an employee for violations of internal rules and policies. *Id.*

7. Clearly, LaRue owed an even greater duty to the corporation as a director and officer.