Lisa Van Amburg, Judge
James Guller appeals the trial court's summary judgment in favor of his former business partner, Michel Waks, in this dispute involving Guller's departure from their jointly-owned company. We affirm.
Background
Cooperative Home Care, Inc. (CHC) was formed by Waks's mother-in-law in 1986. Waks and his wife, Ruth Sontag, took over the business in 1990 and hired Guller as a salesman in 1997. In 1998, Waks and Guller entered into an operating agreement as equal shareholders and executed a Restrictive Stock Agreement (RSA) providing for the continuation of the company in the event of a shareholder's departure, death, or disability. As relevant here, the purpose of the RSA is stated in the recitals as follows:
The Stockholders and the Company believe it is in their mutual best interest to provide for continuity and harmony in the management and policies of the Company. It is the mutual purpose of the Stockholders and the Company: (a) to provide certain options to the Stockholders and to the Company to purchase a Stockholder's Shares prior to any voluntary lifetime or involuntary transfer by such Stockholder and upon the termination of Waks' or Guller's employment with the Company; ... and (f) to provide an option to Waks to purchase all of the Shares of Guller in the event the Stockholders agree they are unable to work together.
Article II of the RSA sets forth the triggers and procedures for a shareholder buy-out. In short, if any shareholder wishes to sell his shares or receives a bona fide offer from a third party, he must first notify the other shareholder, who has the option to purchase those shares at the lesser of either the price dictated by the valuation terms of the RSA (Article IX) or the same price offered by the third party, whichever is less. Article IX provides for a purchase price of fair market value as determined by appraisers appointed by each party, reconciled using averages. These features are discussed further below as relevant to particular points.
From 1998 to 2009, CHC's board of directors was comprised of Waks, Sontag, Guller, and Guller's wife, JoAnne. The Gullers divorced in 2009, and their dissolution judgment divested JoAnne of all interest and role in the company. In the years that followed, tensions mounted between the parties. According to Waks, Guller was ineffective and deceitful in his management of the company. According to Guller, he wished to sell the company starting in *508 2014 and discussed it openly with Waks, but Waks rejected the idea. In early June 2015, Guller explored an opportunity to sell the company to a third party, Michael Laycob, and facilitated Laycob's due diligence inspection of CHC's operations and finances. Around that same time, Waks decided to terminate Guller's employment. On June 26, 2015, Guller received a formal letter of intent from Laycob seeking to buy CHC for $5 million. Three days later, Waks terminated Guller for cause and excluded him from the premises. Waks subsequently obtained an appraisal of CHC and attempted to purchase Guller's shares in the company as provided in the RSA.
Guller refused to accept payment and instead filed a petition to dissolve the company pursuant to § 351.467, though the accompanying business plan proposed a sale of the entire company rather than dissolution. Waks filed a counterclaim alleging breach of contract and seeking declaratory and injunctive relief to enforce the buy-out and prohibit Guller from disclosing confidential information or attempting to sell the company. The parties filed cross-motions for summary judgment and statements of uncontroverted material facts with supporting affidavits, depositions, and other evidence.
The trial court entered summary in favor of Waks, reasoning that § 351.467 was inapplicable here in that the RSA governs the parties' rights and obligations in the event of a third-party offer or termination of employment. The court further found that Guller's termination was effective and properly ratified by CHC's board, including by Guller himself by acquiescence. Consequently, the court ordered Guller to accept the buy-out and pay Waks's attorney fees as required by the RSA.
Guller appeals and asserts that the trial court erred in that: (1) § 351.467 applies notwithstanding the RSA, (2) the letter of intent did not constitute a bona fide offer, (3) Guller's termination was invalid, (4) Guller did not acquiesce to his termination, (5) the valuation of Guller's shares did not comply with the RSA, and (6) Guller was entitled to discover Waks's unredacted attorney invoices.
Standard of Review
Appellate review of summary judgment is de novo, viewing the record in the light most favorable to the party against whom judgment was entered. Comp & Soft, Inc. v. AT & T Corp. , 252 S.W.3d 189, 194 (Mo. App. E.D. 2008). "The purpose of summary judgment is to resolve cases in which there is no 'genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law.' Rule 74.04(c)(6)." Id. "Where the 'genuine issues' raised by the non-movant are merely argumentative or imaginary, summary judgment is proper." Id.
Analysis
Applicability of § 351.467
For point I, Guller asserts that the trial court erred in concluding that § 351.467 is inapplicable. That statute states in pertinent part:
If the stockholders of a corporation of this state, having only two shareholders each of which own fifty percent of the stock therein, shall be unable to agree upon the desirability of continuing the business of such corporation , either stockholder may file with the circuit court in which the principal place of business of such corporation is located a petition stating that it desires to discontinue the business of such corporation and to dispose of the assets used in such business in accordance with a plan to be agreed upon by both stockholders or *509 that, if no such plan shall be agreed upon by both stockholders, the corporation be dissolved. Such petition shall have attached thereto a copy of the proposed plan of discontinuance and distribution and a certificate stating that copies of such petition and plan have been transmitted in writing to the other stockholder and to the directors and officers of such corporation.
(emphasis added) Guller argues that this statute is "self-effectuating" and applies notwithstanding the RSA. In support of his position, Guller recounts the legislative history of § 361.467 suggesting that lawmakers considered but ultimately rejected an express exception for parties' private agreements. He claims that the statute should not be construed to contain such an exception but instead should be interpreted to apply here regardless of the RSA.
Both the plain language of the statute and on-point Missouri precedent squarely defeat Guller's claim. By its own terms, § 351.467 invites shareholders to file a petition for dissolution only if they are unable to agree upon the desirability of continuing the business. The exception purportedly rejected by the General Assembly is already built into the existing language. Confirming this interpretation, on nearly identical facts, the Western District held that § 361.467 is inapplicable when a prior agreement among shareholders provides for the company's continuity in the event of a shareholder's departure. LaRue v. Alcorn , 389 S.W.3d 215 (Mo. App. W.D. 2012). In that case, the court reasoned:
By entering into this agreement, LaRue understood that, if his employment was terminated by Trans-Central for any reason other than by death or disability, this buyout provision would be triggered and he would be bound by it. "It is the most basic principle of contract law that parties are bound by the terms of the contracts they sign and courts will enforce contracts according to their plain meaning, unless induced by fraud, duress, or undue influence." Nitro Distributing, Inc. v. Dunn, 194 S.W.3d 339, 349 (Mo. banc 2006). The Shareholder Agreement anticipated the potential deadlock and provided a solution that insured the corporation's continued existence obviating the need for dissolution. The mere fact that LaRue now wishes to renege on the agreement in no way creates an actual inability to continue the business of the corporation. Therefore, section 351.467 is inapplicable because the corporate Shareholder Agreement represents an agreement between the two equal shareholders regarding continuing the business of the corporation under the circumstances of this case.
Additionally, the uncontroverted facts are that, in April of 2009, LaRue negotiated with Alcorn to purchase her portion of Trans-Central but was unable to obtain financing. Therefore, up until LaRue filed for dissolution under section 351.467, claiming that he and Alcorn were unable to agree on the desirability of continuing the business of the corporation, continuation of the business was never an issue, only which shareholder would continue the business.
Id. at 218.
Likewise here, by entering into the RSA, Guller understood that, if he received a bona fide offer for his shares, the buy-out provision would be triggered, and he would be bound by it. The RSA anticipated a deadlock and provided a solution that ensured the company's continued existence. Additionally, the uncontroverted facts, including the proposed plan attached to Guller's petition, establish that Guller sought to sell the entire company as a going concern, not to dismantle or dissolve *510 it. Continuation of the business was never in doubt, only who would continue it.
Section 351.467 does not apply here;[1] rather, the parties are bound by the terms of the RSA. The trial court did not err in granting summary judgment for Waks. Point I is denied.
Letter of Intent
For point II, Guller contends that the trial court erred in concluding that Laycob's letter of intent constituted a bona fide offer triggering the RSA buy-out provisions. The RSA states in pertinent part:
In the event a Stockholder (hereinafter referred to as "Offering Stockholder") desires to sell, or has received a bona fide written offer from a third-party to purchase, any or all of the Shares owned by him or her, such Offering Stockholder shall promptly give written notice (the "Notice") of such offer to the other Stockholders and the Company. ... Each Stockholder, other than the Offering Stockholder, shall have an option ("First Option") to purchase that number of the Shares so offered that bears the same ratio to all of such Shares as his or her Shares bears to all of the Shares (other than those offered).
(emphasis added)
In the first instance, there is no factual dispute that Guller desired to sell his shares. Given the use of the disjunctive "or" in the above paragraph, that desire alone appears sufficient to trigger Waks's buy-out right. But we also find no genuine factual dispute that Laycob's letter of intent was a bona fide offer as contemplated by the parties under the RSA.
Guller's argument to the contrary is twofold. First, he claims that Laycob's letter isn't a bona fide offer but merely a non-binding proposal to negotiate a possible transaction. He asserts in his brief that, in order to have a bona fide offer, "a stock purchase agreement regarding all shares of CHC would have to have been negotiated and presented to CHC for its execution." In other words, Guller insists that Laycob must complete due diligence, secure financing, and commission the extensive negotiation and preparation of documents that such transactions entail (with corresponding legal fees), only then to have Guller balk at closing and notify Waks of the deal. This position ignores the legal, financial, and practical realities of business acquisitions. When interpreting contracts, this court attempts to avoid absurd results. Wildflower Community Ass'n, Inc. v. Rinderknecht , 25 S.W.3d 530 (Mo. App. W.D. 2000). To be sure, in the context of privity, an offer requires a promise such that acceptance and consideration yield a binding contract. See e.g. Walker v. Rogers , 182 S.W.3d 761 (Mo. App. W.D. 2006) (citing the Restatement (Second) of Contracts § 24 (offer defined)). However, in the context of preemptive rights, such an expectation defies logic and is also unsupported by the present record.
Neither party supplies adequate authority as to what constitutes a bona fide offer for purposes of shareholder preemptive rights. We find some general guidance, albeit in a real estate context, in Schroeder v. Duenke , 265 S.W.3d 843 (Mo. App. E.D. 2008), which describes a bona fide offer, *511 for purposes of triggering rights of first refusal, as "one that is made in good faith, by a person with good judgment and acquainted with the value of the property, with sufficient ability to pay in cash, and based upon fair market value." Id. at 848. Laycob's letter of intent satisfies these criteria and contains exceedingly more detail. The seven-page letter, signed by Laycob, sets out specific terms and conditions that clearly were negotiated between Guller and Laycob, such as: the amount due at closing ($4.375 million); financing of the remainder of the purchase price ($625,000) pursuant to a promissory note; post-closing adjustments to reflect actual working capital; a consulting contract for Guller including $50,000 of the purchase price and specific expense reimbursement benefits; a five-year non-compete agreement; a three-year lease at $84,000 per year, renewable for seven years; and a precise closing deadline of October 15, 2015. This offer was bona fide.
In his deposition, Guller confirmed that a "substantial amount of financial due diligence" had already occurred and "we had an offer ... [I] told [Waks] about the offer, the terms of the offer, and invited him to join me to meet with [their accountant] to discuss the implications of the offer for both of us." Guller's summary judgment memorandum characterizes the letter of intent as a bona fide offer, and his affidavit also refers to the letter as an offer. This record belies Guller's argument on appeal that a factual dispute exists whether Laycob's letter of intent was a bona fide third-party offer as the parties understood that term under the RSA.
Guller's secondary argument on this point fails for the same reasons. Specifically, Guller claims that Laycob's offer doesn't fall within the RSA buy-out provision because it was an offer for all of the shares of CHC rather than only Guller's shares. Again, Guller's interpretation not only is illogical, as an offer for all shares necessarily includes Guller's shares, but also is belied by the express purpose of the RSA and Guller's own statements in the record.
The trial court did not err in granting summary judgment in Waks's favor on this basis. Point II is denied. Given our disposition on this point, we need not reach Guller's third and fourth points challenging the validity of his termination as an alternative triggering event. Thus, we proceed to Guller's remaining points.
Valuation
For point V, Guller contends that the trial court erred in granting summary judgment for Waks because Guller disputed whether the valuation of his shares complied with the RSA. Article IX of the RSA provides that "purchase price per share" shall be "fair market value of the company divided by the total number of shares issued and outstanding on the closing date." If the parties don't agree on value, then each shall appoint an appraiser. If a party fails to appoint an appraiser, then the other party may select a second appraiser. If the appraisals differ by less than 10%, then value shall be the average of the two. If the appraisals differ by more than 10%, then CHC's financial officer shall calculate value, with verification by the company's certified public accountant, and that value shall be averaged with the closest appraisal. Value is defined as book value, with adjustments for life insurance policies, average annual earnings of the company, and a weighted average of the selling shareholder's compensation. Book value is defined as stockholder equity as reflected on the company's balance sheet prepared by the company's independent public accountant in accordance with generally accepted accounting principles.
*512 The summary judgment record on this issue reflects that Waks obtained the first appraisal, and Guller refused to obtain a second appraisal so Waks obtained it. The two appraisals differed by more than 10%, so Waks instructed CHC's financial officer to calculate value pursuant to the RSA with the assistance of CHC's accountant. The accountant's report, also in the record, mirrors the precise valuation terms and formulas set forth in the RSA. Guller conceded in his deposition that he received the appraisals ($1.7 million and $1.148 million, respectively) and the accountant's report (arriving at an average of $1.6 million) but did not review or respond to them. At the time of his deposition, Guller still had not reviewed the appraisals in detail, but he rejected their methodology. Specifically, Guller disagreed with the use of the cost approach (rather than an income approach) because the cost approach reflected book value. As stated above, the RSA expressly requires a valuation based on book value.
Guller contends that this evidence is insufficient in that Waks presented only the accountant's report and not the two full appraisals. He further asserts that the appraisals were defective in that they valued only one share of CHC stock (e.g. , factoring in minority and marketability discount) rather than the company as a whole. Waks counters that the appraisals were provided to the trial court under seal and, moreover, Guller waived this challenge to valuation by failing to obtain his own appraisal, cooperating with and later deposing Waks's appraisers, and then failing to advance this theory before the trial court. Waks does not supply citations to the record for these assertions, and this court's own review was fruitless except in confirming that Guller generally objected to the share value. Even assuming arguendo that Waks didn't adduce the underlying appraisals, if Guller wanted the trial court to inspect them, then Guller could have filed them. But in any event, to the extent Guller suggests that the trial court was required to scrutinize the work product and second-guess the judgment of highly-skilled independent financial professionals, Guller manufactures a factual dispute beyond the court's authority. "Where the 'genuine issues' raised by the non-movant are merely argumentative or imaginary, summary judgment is proper." Comp & Soft , 252 S.W.3d at 194. Based on the summary judgment record before us, we find no genuine issue whether Waks complied with the RSA. Point V is denied.
Attorney Fees
Finally, Guller asserts that the trial court abused its discretion by awarding Waks $189,125 in attorney fees, as accorded to the prevailing party under the RSA, without first permitting Guller to review unredacted invoices to verify that all fees were related to enforcement of the RSA and were reasonable.[2]
The record before the trial court contained multiple affidavits by attorneys in four different law firms attesting to the necessity and reasonableness of the fees, along with unredacted copies of their invoices totaling $222,500. The court reduced that amount by 15% to account for duplication *513 resulting from attorney turnover. Guller insists that additional discounts are warranted for services rendered in June and July 2015 (preceding Guller's petition) and for services he suspects were included in the invoices but unrelated to the RSA. Guller's position lacks support in the present record and Missouri precedent.
The record reflects that conflict between the parties existed before June 2015, and the events triggering buy-out occurred that month. Multiple attorneys verified in their affidavits that the services reflected in their invoices related to the RSA. Moreover, the court that tries a case and is acquainted with all the issues involved may fix the amount of attorney fees even without the aid of such evidence. Clean Unif. Co. St. Louis v. Magic Touch Cleaning, Inc. , 300 S.W.3d 602, 612 (Mo. App. E.D. 2009), citing Nelson v. Hotchkiss, 601 S.W.2d 14, 21 (Mo. banc 1980). "It is presumed that the allowance for attorney fees was for compensable services and that no allowance was made for noncompensable services." Nelson , 601 S.W.2d at 21. We consider the trial court to be an expert on attorney fees. Clean Uniform Co. , 300 S.W.3d at 612. The determination of the amount of fees is within the sound discretion of the trial court, and we will not reverse unless the award is arbitrarily arrived at or is so unreasonable that it indicates indifference and a lack of proper judicial discrimination. Id. Mindful of these principles, we find no basis to disturb the trial court's award here. Point VI is denied.
Waks also requests an award of attorney fees on appeal and has submitted under seal unredacted invoices for this court's inspection in camera. Our court may award attorney fees on appeal if they are authorized by a written agreement that is the subject of the issues presented on appeal. Frontenac Bank v. GB Investments, LLC , 528 S.W.3d 381, 397 (Mo. App. E.D. 2017). We have the authority to either allow and fix the amount of fees on appeal or remand the cause with instructions for the trial court to determine the amount and enter judgment accordingly. Id.
Under the circumstances of this case, where we are denying all of Guller's points on appeal and affirming the trial court's judgment in all respects, it is in the interests of judicial economy for this court to determine the amount rather than remand the cause to the trial court. Id. Therefore, we grant Waks's motion for attorney fees on appeal in the amount of $27,707.50.
Conclusion
The trial court did not err in entering summary judgment in favor of Waks. The RSA supersedes § 351.467. The letter of intent was a bona fide offer as the parties contemplated in the RSA. Waks complied with the RSA in valuing Guller's interest. The trial court did not abuse its discretion in awarding attorney fees to Waks as the prevailing party. The trial court's judgment is affirmed. Waks's motion for attorney fees on appeal, which was taken with the case, is granted in the amount of $ 27,707.50.
Mary K. Hoff, J., and Colleen Dolan, J., concur.

In his reply brief, Guller cites Cannon v. Monroe , 285 S.W.3d 375 (Mo. App. E.D. 2009), for the proposition that he is entitled to relief under § 351.467 because Waks failed to file a certificate of agreement in response to the dissolution plan attached to Guller's petition. In Cannon , the parties owned three companies together and had no prior agreements with respect to two of them. Although they had some agreement regarding the third, the court only mentioned it in dicta and did not specifically address the issue. We find Cannon unhelpful on the present facts, particularly insofar as LaRue is directly on point.

Guller does not assert any right to privileged information. See Keller v. Keller , 224 S.W.3d 73, 83 (Mo. App. S.D. 2007) (observing that a request for attorney fees does not require waiver of attorney-client privilege). He asserts only that he is entitled to the unprivileged portions to determine whether they included charges unrelated to the RSA. That function is well within the trial court's discretion. Guller's pleadings specifically enumerated eleven matters he sought to exclude from the calculation. If there was any doubt whether the charges were proper (notwithstanding attorney affidavits to that effect) the trial court was able to compare that list with the unredacted invoices.