

# In the Missouri Court of Appeals
# Eastern District
## DIVISION THREE

| | | |
|---|---|---|
| TNT AMUSEMENTS, INC., | ) | No. ED108209 |
| | ) | |
| Appellant, | ) | Appeal from the Circuit Court |
| | ) | of St. Louis County |
| vs. | ) | |
| | ) | Honorable Joseph S. Dueker |
| BFC ENTERPRISES, INC. and | ) | |
| BNS&C, LLC, | ) | |
| | ) | |
| Respondents. | ) | Filed: May 19, 2020 |

The plaintiff, TNT Amusements, Inc. d/b/a Play-Mor Coin Op, appeals the judgment entered by the Circuit Court of St. Louis County in favor of the defendants, BFC Enterprises, Inc. and BNS&C, LLC d/b/a Murphy's Bar & Grill ("Murphy's") in this action for tortious interference with a contract, breach of contract, and related claims. The trial court granted BFC's motion for partial summary judgment along with BFC's and Murphy's joint motion for judgment on the pleadings, which the court treated as a motion for summary judgment under Supreme Court Rule 55.27(b).

We conclude that Murphy's notice of nonrenewal of its equipment lease with TNT was not untimely, and therefore, did not result in a breach of its contract with TNT. To find a breach as urged by TNT would require us to interpret the renewal term in the parties' lease in a way that would lead to an illogical, unreasonable, and absurd result. Similarly, BFC cannot be determined to have tortiously interfered with the TNT-Murphy's contract if Murphy's did not breach that

contract. Therefore, we affirm the trial court's grant of summary judgment in favor of the defendants.

## *Procedural and Factual Background*

TNT leases coin- and debit- and credit-card-operated pool tables, video games, jukeboxes, and similar equipment to bars, restaurants, bowling alleys, and other businesses. TNT began leasing equipment to Murphy's Bar & Grill around 2005. Murphy's Bar & Grill underwent a change of ownership shortly before the events giving rise to this lawsuit. At that time, Murphy's leased from TNT five videogames, a pool table, and an internet jukebox. Payments to TNT under the lease consisted of a percentage of revenue generated from the equipment. TNT visited Murphy's every two weeks to collect the funds that Murphy's customers paid to use the pool-table, video games, and jukebox. TNT then paid Murphy's a portion of the revenue.

On June 24, 2012, TNT and Murphy's entered a new equipment lease for a term of five years:

> This Equipment Lease Agreement is entered into this 24th day of ~~April~~ June, 2012, by and between TNT Amusements, Inc. d/b/a Play-Mor Coin Op, a Missouri corporation, ("Play-Mor") and BNS&C LLC, a _____ [sic] aka Murphy's Bar & Grill located at 1229 Castillons Arcade, Saint Louis MO. 63141 County Saint Louis ("Merchant").

The word "April" was written in by hand, crossed out, and replaced with "June," which was likewise written by hand. The preprinted lease form prepared by TNT contained the following pertinent provisions:

> 2.   **Term of Lease Agreement.**
> 2.1 This Lease shall be for a term of five (5) years commencing on [sic] and shall automatically renew upon the same terms and conditions herein set forth, unless either party notifies the other party by written notice of their intent to terminate this Lease within thirty (30) days prior to the end of the then existing term.

2

2.2 Merchant shall not allow any other coin-operated or credit/debit card operated equipment on Merchant's premises without the express written consent of Play-Mor.

***

10. **Miscellaneous.**

***

10.4 All notices required hereunder shall be provided to the parties at the addresses set out below unless the parties are notified in writing to the contrary. All such notices shall be by certified mail, return receipt requested unless the parties agree to the contrary.

The lease does not specify the exact beginning or ending date of the five-year term.

The trial court found that the lease commenced June 24, 2012, and the parties no longer dispute that commencement date. During discovery, TNT's vice president and co-founder, who signed the lease on behalf of TNT, testified in his deposition that he was the person who handwrote "June" on the original 2012 lease. Murphy's managing member testified in his deposition that he remembered meeting with TNT's vice president and co-founder in June 2012, and at that time he signed the lease produced by TNT.

In December 2016, during the term of the TNT-Murphy's lease, Murphy's entered a contract to lease coin- and debit- and credit card-operated equipment from TNT's competitor, BFC Enterprises, Inc. Murphy's asked TNT to remove its equipment because Murphy's had decided to contract with another provider. TNT reminded Murphy's that the parties had a five-year lease, and so the TNT equipment remained at Murphy's, and TNT made regular collections visits into May 2017.

In early May 2017, Murphy's inquired about removal of TNT's equipment on the next collection date in mid-May, but Murphy's did not pursue the issue and TNT's equipment remained in place. Later in May, one of BFC's owners, unbeknownst to Murphy's management, instructed BFC employees to disconnect TNT's jukebox and install a BFC jukebox at Murphy's.

3

When Murphy's managing member discovered the disconnection of TNT's jukebox, he had the TNT jukebox reconnected and the BFC jukebox removed from Murphy's. TNT's jukebox was disconnected for a few days to perhaps one week during May 2017, but returned to normal operations and collections once Murphy's management discovered the disconnection.

Murphy's sent notice dated May 19, 2017 by email and certified U.S. mail, return receipt requested, to TNT, stating that "[t]his letter is your 30 day notice that as of June 24, 2017, the expiration date of the 5 year contract between your company and BNS&C, LLC, our contract will not be renewed. As of June 24, 2017 all business between your company and ours will be concluded." Murphy's letter sent by certified mail, return receipt requested, was delivered to TNT on May 23, 2017.

TNT filed suit against Murphy's and BFC the next day, on May 24th, alleging tortious interference and trespass to chattels against BFC and breach of contract against Murphy's. TNT also sought preliminary and permanent injunctive relief against BFC and a declaratory judgment stating that TNT and Murphy's had a "valid and subsisting contract." TNT averred in its petition that it had entered a five-year lease with Murphy's on April 24, 2012; that the lease had automatically renewed for another five-year term on April 24, 2017; that Murphy's written notice was provided too late; and that BFC had taken concrete steps to interfere in TNT's contract rights with Murphy's and with TNT's property rights in its equipment placed at Murphy's. Murphy's filed a motion to dismiss TNT's petition, and BFC joined in the motion to dismiss. After hearing argument on the defendants' motion to dismiss, the court issued its August 1, 2017 order, which allowed TNT twenty days to file an amended petition, dismissed TNT's claims for injunctive relief, and ordered TNT to remove its equipment from Murphy's within one week. TNT ultimately removed its equipment from Murphy's premises pursuant to the trial

4

court's order. Having removed its jukebox from Murphy's in May 2017, BFC did not place any equipment at Murphy's until after TNT removed its equipment in August 2017.

TNT then filed its first amended petition with counts for tortious interference (count I) and trespass to chattels (count II) against BFC, and with counts for breach of contract (count III) and promissory estoppel (count IV) against Murphy's. TNT's position presented in its first amended petition was that the lease commenced on April 24, 2012 and automatically renewed for a five-year term on April 24, 2017, and thus Murphy's written notice was provided too late; that BFC tortiously interfered with TNT's contract with Murphy's by convincing Murphy's to seek removal of TNT's equipment and replacement with BFC equipment; that BFC trespassed in disconnecting TNT's jukebox in May 2017; and that Murphy's materially breached its contract with TNT by repudiating the lease for TNT equipment, failing to remit revenues, and by doing business with BFC. TNT did not aver that Murphy's notice of non-renewal was premature and therefore ineffective as TNT now argues on appeal.

TNT filed a motion for summary judgment as to the breach of contract and promissory estoppel counts against Murphy's. BFC and Murphy's filed a joint motion for judgment on the pleadings, which the trial court treated as a motion for summary judgment pursuant to Rule 55.27(b) because the parties presented matters outside the pleadings that the court did not exclude. BFC filed a motion for partial summary judgment as to the tortious interference and trespass counts against it. In TNT's opposition to BFC's motion for partial summary judgment and in support of its own motion for summary judgment, TNT argued for the first time that Murphy's termination notice was premature and therefore ineffective.

Finding that the equipment lease commenced for a five-year term on June 24, 2012, the trial court concluded that "TNT's interpretation of the notice provision would lead to an absurd

5

result . . . ." The trial court denied TNT's summary judgment motion, and granted BFC's partial summary judgment motion as well as Murphy's and BFC's joint motion for judgment on the pleadings, except for those claims in count II, trespass to chattels, relating to the disconnection of TNT's jukebox. TNT then dismissed without prejudice its remaining claims in count II, disposing of all claims in the case. TNT appeals.

## *Discussion*

On appeal, TNT claims the trial court erred in granting the defendants' joint motion for judgment on the pleadings as to TNT's claim for breach of contract against Murphy's (count III), and in granting BFC's motion for partial summary judgment as to TNT's claim for tortious interference against BFC (count I). TNT does not appeal the judgment in favor of the defendants regarding its claims for trespass to chattels in count II and promissory estoppel in count IV.

### *Standard of Review*

Rule 55.27(b) states in pertinent part that "[i]f, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 74.04 . . . ." Here, the trial court treated the defendants' joint motion for judgment on the pleadings as a motion for summary judgment because the parties presented matters outside the pleadings both in support of the joint motion and in opposition to it, and the court did not exclude those matters.[1] Accordingly, we review TNT's appeal as a grant of summary judgment for the defendants.

Summary judgment allows a trial court to enter judgment for the moving party when the party establishes a right to judgment as a matter of law based on facts about which there is no

---

[1] TNT argued below that the defendants' joint motion for judgment on the pleadings "must be treated as one for summary judgment."

6

genuine dispute. *ITT Commercial Fin. Corp. v. Mid–Am. Marine Supply Corp.,* 854 S.W.2d 371, 376 (Mo. banc 1993). Our review is essentially *de novo. Id*. We review the record in the light most favorable to the party against whom the court entered judgment. *Id.* We will affirm a summary judgment under any appropriate theory supported by the record. *Blackwell Motors, Inc. v. Manheim Services Corp.*, 529 S.W.3d 367, 373 (Mo. App. E.D. 2017).

A defending party that moves for summary judgment need not controvert each element of the non-movant's claim in order to establish a right to summary judgment. *Behlmann v. Weaks*, 150 S.W.3d 153, 155 (Mo. App. E.D. 2004). Rather, one way a defending party may establish a right to summary judgment is by showing facts that negate any one of the claimant's elements facts. *Id*.

*Claim for Breach of Contract Against Murphy's*

In its first point, TNT claims the trial court erred in granting the defendants' joint motion for judgment on the pleadings as to TNT's claim for breach of contract because Murphy's was not entitled to judgment as a matter of law in that TNT alleged all of the necessary elements of a breach of contract claim, including that the equipment lease renewed for a second term and that Murphy's repudiated the equipment lease as to its renewal term. TNT contends that such allegations are supported by the plain and ordinary meaning of the terms of the equipment lease.

In a breach-of-contract action, the plaintiff must establish: 1) the existence and terms of a contract; 2) the plaintiff's performance or tender of performance under the contract; 3) the defendant's breach of the contract; and 4) damages suffered by the plaintiff. *Truman Bank v. New Hampshire Ins. Co.*, 370 S.W.3d 675, 676 (Mo. App. E.D. 2012) (citing *Keveny v. Missouri Military Academy*, 304 S.W.3d 98, 104 (Mo. banc 2010)).

7

TNT contends that Murphy's breached the parties' contract because Murphy's notice of nonrenewal of the lease was untimely. Specifically, TNT argues that:

> The plain language of the Renewal Clause required notice of nonrenewal to be sent *not more than* thirty days prior to the end of the lease. It is undisputed that Murphy's never sent notice of nonrenewal during this period, and therefore the Equipment Lease renewed for an additional five-year term on June 25, 2017.[2]

Emphasis in original (internal citations omitted). TNT argues that the phrase "within thirty (30) days prior to the end of the then existing term" plainly means, in accord with basic principles of logic and grammatical construction, that "notice of nonrenewal is required to be sent during the last thirty days of the existing term of the lease; notice sent earlier than the thirtieth day prior [to] the expiration of the lease is premature and untimely." TNT further argues that "[e]nforcing the Renewal Clause in accordance with its plain language such that notice of nonrenewal must be sent within the last 30 days of the Equipment Lease, does not lead to absurd or unreasonable results."

Murphy's counters that TNT's construction of the equipment lease needlessly works to the disadvantage of both parties, and that TNT cannot establish any damages as a proximate result of the alleged breach.

"The cardinal principle of contract interpretation is to ascertain the intention of the parties and to give effect to that intent." *J.H. Berra Constr. Co., Inc. v. City of Washington*, 510 S.W.3d 871, 874 (Mo. App. E.D. 2017)(quoting *Dunn Indus. Group, Inc. v. City of Sugar Creek*, 112 S.W.3d 421, 428 (Mo. banc 2003)). We read the contract as a whole to determine the parties' intent, and we give the terms used their plain and ordinary meaning. *Id*. We determine the

---

[2] The original lease between TNT and BNS&C, LLC d/b/a Murphy's Bar and Grill was entered June 24, 2012 for a period of five years. Thus, the original lease term would have expired at 11:59:59 p.m. on June 23, 2017, and automatically renewed—if not terminated with written notice—at 12:00 a.m. on June 24, 2017. Renewal on June 25, 2017 would result in an original lease term of five years plus one day.

parties' intent based on the contract alone, and only when an ambiguity appears on the face of the contract do courts look outside the contract to determine the parties' intent. *Id*. An ambiguity exists in a contract when there is duplicity, indistinctness, or uncertainty in the meaning of the words used. *Id*. The parties' disagreement about its meaning does not render a contract term ambiguous. *Fed. Nat'l Mortgage Ass'n v. Pace*, 415 S.W.3d 697, 703 (Mo. App. E.D. 2013). Here, we find no ambiguity in the disputed phrase.[3]

In addition, "[w]hen interpreting contracts, this court attempts to avoid absurd results." *Guller v. Waks*, 550 S.W.3d 505, 510 (Mo. App. E.D. 2017). "We interpret contracts to reach fair, reasonable, and practical results, for it is to be presumed that the parties contracted to that end." *Patterson v. Rough Road Rescue, Inc.*, 529 S.W.3d 887, 894 (Mo. App. E.D. 2017). We will reject interpretation of a contract that yields unreasonable results when a probable and reasonable construction can be adopted. *Id*.; *Belton Chopper 58, LLC v. North Cass Dev., LLC*, 496 S.W.3d 529, 532 (Mo. App. W.D. 2016). Furthermore, "[u]nder an automatic renewal clause in a lease, the right not to renew is for the lessee's benefit." *Behlmann*, 150 S.W.3d at 156.

To support its position that the lease required Murphy's to send notice of nonrenewal "during the last thirty days of the existing term of the lease" and that "notice sent earlier than the thirtieth day prior [to] the expiration of the lease is premature and untimely," TNT relies primarily on the California case of *Wilson v. Gentile*, 8 Cal. App. 4th 759, 764 (1992). In *Wilson*, the tenant entered a residential lease with the landlord. 8 Cal. App. 4th at 761. The agreement provided an option for the tenant to purchase the property, and required the tenant to exercise the option in writing "within thirty (30) days prior to the expiration of this option." *Id*. Seven days

---

[3] Even if such an ambiguity existed, it would not benefit TNT, the drafter of the contract. If there is no evidence of the parties' intent, courts construe any ambiguous language in a contract in the light most favorable to the party that did not draft it. *J.H. Berra*, 510 S.W.3d at 874.

before the option expired, the tenant wrote the landlord to exercise the purchase option. *Id*. The landlord refused to acknowledge the letter or to honor the option, contending that the language "within thirty (30) days prior to expiration of this option" required the tenant to provide written notice "no later than" 30 days prior to the expiration of the option. *Id*. As TNT correctly points out, the *Wilson* court concluded that the words "within . . . days prior to . . ." required the tenant to give notice inside a period starting with the beginning point thirty days before expiration of the option and terminating with the end point date on which the six-month option expired. *Id*. at 764.

However, *Wilson* does not fully support TNT's position. In response to the landlord's argument, the *Wilson* court proceeded to distinguish a purchase option required to be exercised "within . . . days prior to . . ." from a lease renewal that required notice of renewal or nonrenewal to be exercised "within . . . days prior to expiration of" the initial lease. *Id*. The *Wilson* court explained:

> To argue the "within ... days prior to ..." language should not be given this obvious and logical interpretation in the context of "options to buy," [the landlord] points to California and non-California cases interpreting this language in the context of "options to renew leases." These cases all confront a unique situation. The lessee is given an option to renew the lease for a subsequent time period which option is to be exercised "within ... days prior to the expiration of" the initial lease. *This language creates a patent absurdity if the "within ... days prior to ..." language is given the same ordinary and logical interpretation as it is in most other contexts.* The absurdity is that the lessor may not learn whether the lessee is exercising his or her option to renew until the moment the lease expires. . . .
>
> Faced with this absurd result, the courts early on decided to rescue lessors from their poor choice of words and treat the word "within" as if it did not exist.

*Id*. (emphasis added).

The parties do not direct us to any Missouri case that interprets a lease renewal containing the language "within . . . days prior to" expiration of the initial lease term, and our

10

own research reveals none. While not binding on this Court, we nonetheless find *Wilson's* analysis instructive. In the context of a lease renewal or nonrenewal, the language "within thirty (30) days prior to the end of the then existing term" creates a patent absurdity if literally interpreted to mean, as TNT urges here, that notice of nonrenewal sent 36 days and delivered 32 days before expiration of the original lease term is untimely and constitutes a breach of contract because notice was not sent during the last thirty days of the equipment lease.

Courts in other jurisdictions have considered similar language, and reached a similar result as cited in *Wilson*. In *Berkow v. Hammer*, the Virginia Supreme Court rejected a lessee's argument that the phrase "within sixty days prior to the expiration of this Lease" required written notice of his intention to renew the lease no more than sixty days before expiration of the initial lease term. 53 S.E.2d 1, 2-3 (Va. 1949).

> Although we have not had occasion heretofore to construe the word "within," when used in conjunction with the words "prior to," we do not find the problem of interpretation difficult, viewing the option in the light of options customarily used in leases. So used its meaning is neither unusual nor strained. It is well recognized in law. Courts in other jurisdictions have invariably construed the words to mean "not later than." Not a single case to the contrary has been cited, and we have been unable to find one.

*Id*. at 3. The *Berkow* court continued:

> Any such construction as [the lessee] would put upon the renewal clause would render null and void any notice given more than sixty days before the expiration of the first period. It would be giving the option an *unreasonable and unjust interpretation, unfair to both lessee and lessor.*
> It is our conclusion, fortified by reason and authority, that the language of the renewal clause clearly required that notice be given not later than sixty days before the expiration date of the first five-year period in the lease to entitle the lessee to the additional period.

*Id*. at 5 (emphasis added).

Likewise, in *Drummond Co. v. Friedman*, the Alabama Supreme Court interpreted the phrase "to be renewed within six months prior to the expiration of the preceding initial term" to

11

mean that the lessee was required to provide to the lessors notice of its intention to renew *not later than* six months before the expiration date. 350 So. 2d 323, 324-25 (Ala. 1977). *See also State v. Griffin*, 370 A.2d 1301, 1305 (Conn. 1976)(holding creditor's claim against estate was not barred under statute although creditor presented notice before application and appointment of administrator); *Pryor v. Pryors, Printers*, 110 P.2d 229, 233 (Ariz. 1941)(interpreting a lien statute, the court opined "under the authorities the word 'within' when used in connection with the word 'before' should be construed to mean 'not later than,' or 'at any time not less than.'").

Under these facts, we find a more logical interpretation of the phrase "within thirty (30) days prior to the end of the then existing term" contemplates that, in order to be timely, notice should be given not later than, or not less than, thirty days prior to the end of the existing term.

TNT analogizes its lease renewal language to Missouri statutes that use language "within [a period of time] prior to [a boundary point]." TNT's comparisons miss the mark. TNT cites to section 351.467 RSMo. (2016), regarding treatment of shares of stock owned by "related taxpayers" "at any time within ninety days prior to the date upon which a petition" is filed for discontinuation of a corporation. Section 351.467 has no relation to any action that a party must take within a specified time before a deadline.[4] Similarly, neither the other statute[5] nor any of the other cases that TNT cites to support its interpretation of the equipment lease involve a party found in breach of contract or otherwise penalized for acting too early. None of the cited cases

---

[4] Section 351.467.3 begins "[i]f, at any time within ninety days prior to the date upon which a petition is filed pursuant to subsection one of this section . . . ." The purpose of this section is to "prevent parties from transferring stock around in anticipation of filing a petition for purposes of dissolving [a corporation] under Section 351.467, when they otherwise would not have been eligible." *Steinmann v. Davenport*, 248 S.W.3d 8, 17 (Mo. App. E.D. 2008). *Steinmann v. Davenport*, cited by TNT, does not address the meaning of the phrase "within ninety days prior to" used in the section 351.467.3.

[5] TNT also cites section 238.060 RSMo. (2016), concerning appointment of commissioners to the Kansas City Area Transportation District Authority. No appellate case has ever cited section 238.060, much less interpreted the meaning of its phrasing "[w]ithin sixty days before the expiration of the term of each commissioner" in a challenge alleging a premature appointment.

involve actions purportedly taken prematurely. None of the cited cases consider or interpret the meaning of "within" a specified time "prior to" or "before" an event.

We find a more logical analogy in Missouri Supreme Court Rule 81.05(b), which provides that "[i]n any case in which a notice of appeal has been filed prematurely, such notice shall be considered as filed immediately after the time the judgment becomes final for the purpose of appeal." In short, this Court treats as timely a notice of appeal that is filed early. "The rationale behind Rule 81.05(b) is to protect 'litigants whose counsel in an abundance of caution or by mistake file premature notices of appeal in such situations.'" *Estate of Schler v. Benson*, 947 S.W.2d 495, 500 (Mo. App. W.D. 1997).

In *Estate of Schler*, the Western District determined that the plaintiff's notice of intent to exercise his option to purchase the family farm was effective even though given prior to the triggering event for the beginning of the option period set forth in the decedent's will. *Id*. at 496-97. Agreeing that the plaintiff's notice was premature, the Court continued:

> The only reported cases on this or similar issues from other states have held that if notice is required to be given "within" a certain time after a specified event, it simply means that notice must be given *not later than* the time specified; *it does not invalidate notice given prior to the specified time*.

Second emphasis added. *Id*. at 499. *See also Kleim v. Sansone*, 248 S.W.3d 599, 602 (Mo. banc 2008)(stating that although plaintiff filed will-contest petition before period specified in statute, her early filing does not render claim invalid).

Indeed, *Estate of Schler* offers an additional rationale to support finding that Murphy's notice was timely. The *Schler* Court concluded:

> That rationale [of Rule 81.05(b)] has equal application here. [The plaintiff's] March 26, 1996, notice, while premature, was not ineffective. Its effect was simply suspended until first publication of notice of letters occurred on April 6, 1996. It then took immediate effect. Because the notice is thus considered as if given the very first day it could be given, it clearly was timely.

13

*Estate of Schler*, 947 S.W.2d at 500. Applying the same reasoning here, the effect of Murphy's nonrenewal notice received by TNT on May 23, 2017 was simply suspended until the thirty-day period began May 25, 2017. Murphy's notice then took immediate effect, and was not invalidated. Considering Murphy's notice as if effective the very first day that TNT argues timely notice could be given also results in a more reasonable interpretation for both parties.

For the foregoing reasons, we conclude that TNT's interpretation of section 2.1 of the equipment lease leads to an illogical, unreasonable, and absurd result. Accordingly, we adopt the more reasonable interpretation, and hold that the written notice received by TNT via certified mail on May 23, 2017 provided, under the terms of the parties' contract, timely notice of Murphy's nonrenewal of the equipment lease.

Finally, TNT argues that "Defendant Murphy's breached the Equipment Lease by repudiating the lease as to the renewal term." TNT points to the following actions by Murphy's as evidence of repudiation: (1) that on May 2, 2017, Murphy's managing member asked whether it was possible for TNT to remove its equipment on May 16th although TNT did not, in fact, remove its equipment on that date; (2) that Murphy's managing member again asked on May 16, 2017 about removal of TNT's equipment; (3) that Murphy's "permitted" a competitor, BFC, to tamper with TNT's equipment and replace it with the competitor's equipment; (4) that Murphy's sent a letter on May 19, 2017 purporting to terminate the equipment lease at the end of its term; and (5) that Murphy's filed a motion to dismiss TNT's lawsuit.

Having concluded that Murphy's provided timely notice of nonrenewal of the equipment lease, Murphy's could not have repudiated the lease as to the renewal term when the initial lease term ended June 23, 2017 and did not renew. As discussed above, Murphy's sent written notice that it would not renew the lease by certified mail, return receipt requested on May 19, 2017.

14

TNT received this notice on May 23, 2017. When a lessee has an option to renew the lease for a subsequent period—which option is to be exercised "within . . . days prior to the expiration of" the initial lease—this language creates a patent absurdity if we give the "within . . . days prior to . . ." language the same ordinary and logical interpretation as courts give it in most other contexts. *Wilson,* 8 Cal. App. 4th at 764. Likewise, to interpret the renewal language as TNT advocates would result in "an unreasonable and unjust interpretation, unfair to both lessee and lessor." *Berkow*, 53 S.E.2d at 3.

The unreasonableness of TNT's interpretation becomes more apparent when we consider that section 10.4 of the lease requires written notice provided by certified mail, return receipt requested, and that TNT argues notice can only be *sent* within the thirty days immediately preceding lease expiration. TNT's interpretation means that Murphy's had thirty days or less to mail a certified letter providing notice of nonrenewal. Thus, Murphy's could have mailed a certified letter on the last day of the existing lease term, June 23, 2017. Then TNT would have been required to wait several days beyond the term of the initial lease to receive the letter and learn whether Murphy's intended to renew the equipment lease. It is illogical, unreasonable, and absurd to suggest that this interpretation better represents the mutual intent of the parties rather than notice received 32 days prior to expiration of the initial lease term.

We decline to interpret the equipment lease in the manner urged by TNT so as to avoid an illogical, unreasonable, and absurd result. We conclude that Murphy's written notice sent by U.S. certified mail, return receipt requested on May 19, 2017 and received by TNT on May 23, 2017 provided the timely notice of nonrenewal required by the equipment lease. As a result, Murphy's neither breached its contract with TNT by providing notice of nonrenewal

15

prematurely, nor repudiated the lease as to a nonexistent renewal term. We deny TNT's first point.

*Claim for Tortious Interference Against BFC*

In its second point, TNT claims the trial court erred in granting BFC's motion for partial summary judgment as to TNT's claim for tortious interference because BFC was not entitled to judgment as a matter of law in that BFC failed to negate any of the elements of TNT's claim for tortious interference, including that Murphy's breached the equipment lease by repudiating its renewal term.

Tortious interference with a contract or business expectancy has five elements: (1) a contract or valid business expectancy; (2) the defendant's knowledge of the contract or relationship; (3) intentional interference by the defendant inducing or causing a breach of the contract or relationship; (4) the absence of justification; and (5) damages resulting from the defendant's conduct. *Envirotech, Inc. v. Thomas,* 259 S.W.3d 577, 590 (Mo. App. E.D. 2008).

As discussed in Point I, TNT cannot establish a breach of contract based on Murphy's notice of nonrenewal provided to TNT 32 days prior to expiration of the original lease term. Breach of a contract induced or caused by the defendant is a necessary element of a claim for tortious interference with a contract. *Id*. As a result, TNT's claim against BFC for tortious interference with a contract based on Murphy's decision not to renew the equipment lease fails as a matter of law. We deny TNT's second point.

***Conclusion***

We conclude that Murphy's did not breach its contract with TNT. To find a breach as urged by TNT would require us to interpret the parties' contract in a manner that would lead to an illogical, unreasonable, and absurd result. Similarly, BFC cannot be determined to have

16

tortiously interfered with the TNT-Murphy's contract by causing or inducing a breach of contract when no breach occurred. Therefore, we affirm the trial court's grant of summary judgment in favor of the defendants.

_____
Angela T. Quigless, Judge

Mary K. Hoff, P.J., and
Sherri B. Sullivan, J., concur.